[Civ. No. 6479. First Appellate District, Division One.—February 16, 1929.]

HAYDEN PLAN COMPANY (a Corporation), Appellant, v. WILL C. WOOD, etc., Respondent.

2

Kimball Fletcher for Appellant.

Albert A. Rosenshine for Respondent.

PARKER, J., *pro tem.*—The purpose of the action is to secure a declaratory judgment and, as ancillary thereto, a judgment and order restraining and enjoining the defendant as Superintendent of Banks from interfering in anywise with plaintiff corporation or its conduct of its business. Judgment in the court below was against plaintiff and the appeal follows. It is the contention of plaintiff corporation, generally, that it is not amenable to the regulation of, nor subject to, the control of the Superintendent of Banks, inasmuch as the business in which it is engaged is not in any of its features a business such as contemplated in the California Bank Act. Without further generalization we will examine into the detail of the case. The plaintiff is a corporation organized and existing under and by virtue of the laws of the state of Delaware and by compliance with the general corporation laws of the state of California is qualified to transact business in the state. The term of corporate existence is perpetual. The powers of the corporation are very

broad and in particular include the power "to act as the general or special agent, or attorney in fact, for any public or private corporation or person." The plan of business of the corporation may be briefly summarized as follows: The corporation receives the money of the individual investor, either in a lump sum or in installments, and the investor executes and delivers to the corporation a power of attorney wherein and whereby he appoints the corporation his agent and attorney in fact for certain limited purposes. Upon receipt of such document the corporation delivers to the investor a textual duplicate bearing the acceptance of the appointment indorsed at the bottom. The power of attorney authorizes the corporation to deduct from the moneys paid by the investor twenty per cent for its own use as payment for its services in creating the united funds and in handling and investing the same. It further authorizes the corporation as such agent, to unite the funds of each investor with those of each other investor, received upon substantially similar terms, and limits the permanent investment of the funds received to the class of real property usually known as "income property." From the net annual proceeds of the operation of such income property the corporation is empowered to set aside two per cent as a sort of surplus fund; to pay itself, as a commission for its services, eighteen per cent, and to distribute the remaining eighty per cent substantially *pro rata* to the individual investors. The power of attorney is declared to be irrevocable and contains no provision for the return of the principal sum invested under any circumstances. This outlines the general features of the proposed activities, though the detail is more elaborate. The methods employed may be further investigated. Naturally, the first step in the plan is to obtain funds. The investor is solicited and, if the solicitation is successful, he pays his money into the corporation, either in a lump sum or in installments, and as evidence of his payment he receives a copyrighted receipt or certificate, which reveals to him exactly the nature of the investment. In case the articles of agreement might not fully advise the investor there is pointed out at the top these words: "Built for Eternity." The actual agreement provides: The investor pays a certain sum and makes the corporation his true and lawful attorney to do the following things, namely: One: To unite the

funds he pays or shall pay with all other funds paid to said agent on substantially similar terms by any person whomsoever. Two: To use the funds so united at and in the sole discretion of the board of directors of said corporation in the purchase, leasing, furnishing, construction, operation, sale, and exchange of income producing buildings, either in the state of California or elsewhere. To acquire by purchase, lease, exchange or otherwise, land, buildings, and hereditaments of any tenure or description, etc. The power to operate shall include the power to act as innkeeper, apartment house operator, warehouseman, or in any other capacity, either of like nature or otherwise, at the sole discretion of the corporate directors. Any power given to acquire and hold property may be exercised by, through or in the name of any other person, firm, or corporation as the directors of the corporation may direct. Three: Provisions for default and forfeiture. Four: The investor agrees that he will not attempt to transfer his rights prior to full payment of his subscription unless the corporation shall consent thereto. Five: The corporation is given the right to deduct from the payment its percentage and retain the same for its services in promoting the creation of the united funds. Six: After the investor has paid his subscription in full the corporation is to hold the money he has paid in a special fund to be known as the ''Building Fund''; there is to be added to the building fund all proceeds of the sale of properties acquired with its funds, but all proceeds of such sale in excess of the original cost, plus carrying charges of the individual property, may, at the sole discretion of the board of directors, be added to ''Income Account.'' On the sole direction of the board of directors they may discriminate between the investors who have made partial payments and the discrimination may be in using the partially paid amounts of some and not others for investment. Seven: To create a special fund known as ''Income Account'' from the net proceeds of operating income producing buildings; and from the ''Income Account'' and from ''Building Fund'' and ''Replacement Fund'' during such times as there are not sufficient funds in ''Income Account,'' to pay general administration, clerical, legal, and other expenses at the sole discretion of the board of directors. Eight: To set aside from said income account each year, as a ''Replacement Fund'' the per-

centage of the original cost of each building constructed by the corporation and then so held and of the estimated original cost of each other building then so held which, if so set apart annually, will be sufficient, with interest at five per centum per annum, compounded semi-annually, to rebuild such business at its original cost forty years from its construction or acquisition; this fund shall be invested and re-invested in securities of the classes that are or may be legal investments for court trusts according to the laws of New York or California. To use said ''Replacement Fund,'' or any part thereof, in remodeling, reconstructing, repairing, or replacing any building held by the corporation and to transfer to the building fund, if and when any building is sold or otherwise disposed of, the amount held in said fund to replace said building; anticipating that normally a rate of interest will be secured upon the ''Replacement Fund'' greater than five per centum per annum, to hold such excess in the building fund or income account as the board of directors may determine. Nine: Annually from the income account (after making the deductions required by clauses seven and eight) to deduct, hold, and use to the use of the corporation, eighteen per centum as commission for services and to deduct two per centum of the whole and hold in a separate fund, to be known as ''Protection Fund,'' and to pay the balance, annually or oftener, to the contributors to the united funds, *pro rata*. Provided, that prior to the expenditure of the entire ''Building Fund'' this right to *pro rata* payments from the ''Income Account'' shall not extend to all contributions, but only to a certain class of contributors, to be determined by the directors in accordance with the following rules: (a) When the amount of expenditure from the ''Building Fund'' in acquiring the first building has been ascertained the board of directors shall enumerate the amounts held in the building fund in order of date of appropriation to that fund, together with the names of the contributors thereof (except the names of those who have forfeited) until the total of amounts shall equal the amount of said expenditure, and shall then close the list; (b) the contributors so named shall constitute the class to receive the *pro rata* payments in the manner provided herein until the first net proceeds from the second building shall have become a part of the income account; (c) then said board of

directors shall add to said list, in like manner, until the amounts added shall equal the amount of expenditure for the second, and shall then again close said list; (d) All of the contributors named in the list, as amended, shall constitute the class to receive said *pro rata* payments until the first net proceeds from the third building shall have become a part of the "Income Account"; (e) The board of directors shall in like manner determine the class to receive said payments upon the coming into the income account of the first net proceeds of each successive building until all contributors to the fund shall be included within the class; provided that the distributive share of any contributor, whose partial payments shall have been added to the "Building Fund" prior to his having paid the full sum, except he have forfeited under clause three, shall be in such proportion to a full share as the amount paid to said agent at the time of transfer to that fund shall bear to two hundred dollars; and, provided, further, that the distributive share of any contributor who shall have contributed more than two hundred dollars in a single payment and shall have executed a single certificate shall be in such proportion to a full share as the amount so contributed shall bear to two hundred dollars. The "Protection Fund" to be held and banked or invested in such securities as are described in clause eight hereof and at the sole discretion of the board of directors of the corporation, to be transferred, from time to time, wholly or in part, either to the "Income Account" or "Building Fund." Eleven: To deposit any funds in hand in any reputable banking institution or to invest the same, pending the opportunity to disburse them in accordance with the foregoing directions, in such securities as are described in clause eight hereof, paying all interest and net profits into the "Protection Fund." And if, at any time or times, it be required by law or any public officer or authority that taxes, assessments, license fees, or substantially similar charges (not including individual income, inheritance, or estate taxes of the several contributors) be paid in deposits of moneys or securities be made by the corporation, in behalf of itself or its contributors, the corporation may, at the sole discretion of its board of directors, use and make such payment or deposits of any funds in the corporation's hands or control, including "Building Fund," "Protection Fund" and "Re-

placement Fund." The agreement then confers a general power of attorney upon the corporation, with power of substitution, and the power of attorney thus conferred is irrevocable. The plaintiff in its complaint sets up the facts detailed and the form of contract it purposes to make, as outlined. It then alleges that the defendant Superintendent of Banks will, unless restrained by court order, or unless plaintiff corporation complies with the laws of California relating to trust companies, cause plaintiff, its officers and agents, to be prosecuted for violation of such laws if plaintiff makes contracts with principals in California. Plaintiff sought judgment declaring the rights of the parties and restraining defendant as such Superintendent of Banks from interfering in anywise with plaintiff or its conduct of the business. Defendant appeared in the court below in response to a preliminary order to show cause why an injunction *pendente lite* should not issue restraining the defendant from interfering with plaintiff or the conduct of its business, and the application was presented upon the verified complaint and was submitted on that alone. The order to show cause was discharged and the application for injunction *pendente lite* was denied. Hence this appeal. It will be unnecessary at the outset to catalog the contentions of each party. As the opinion proceeds those contentions will be taken up as raised. Defendant Superintendent of Banks contends that the plan of business of plaintiff corporation constitutes a trust business and that a trust business is a banking function and properly falls within the regulation of the Bank Act of the state of California. Also, the defendant urges that the Bank Act is constitutional and a proper exercise of the police power and that no trust business can be carried on by any corporation in California unless it shall have complied with the provision of the California Bank Act. The statute referred to as the Bank Act may be found in chapter 76 of the Statutes of 1909, page 87 of volume of 1909 Statutes, and such amendment thereto as may have taken place during the year intervening. Section 2 of the Bank Act reads: "The word 'bank' as used in the act shall be construed to mean any incorporated banking institution which shall have been incorporated to conduct the business of receiving money on deposit, or transacting a trust business as herein defined. . . . Banks are divided into

the following classes: (a) Savings banks; (b) commercial banks; (c) trust companies."

Section 6 of said act reads: "The term 'trust company' when used in this act means any corporation which is incorporated under the laws of the state for the purpose of conducting the business of acting as executor, administrator, guardian of estates, assignee, receiver, depository or trustee under appointment of any court or by authority of any law of this state, or as trustee for any purpose permitted by law." We see no need here to discuss the constitutionality of the Bank Act. Nor is it necessary to detail the reasons underlying such legislation. The act is constitutional and a needful and legitimate exercise of police power. (*Estate of Wellings*, 192 Cal. 506 [221 Pac. 628]; *Bank of Italy* v. *Johnson*, 200 Cal. 1–12 [251 Pac. 784].) Further, there can be no doubt that a trust business as defined in said act does fall logically and legally within the scope of the act and as a part of the principle underlying the legislation. (*Estate of Wellings*, 192 Cal. 506–518 [221 Pac. 628].) In the Wellings case it is said: "Trust companies that receive deposits and make loans perform two of the most important functions that are performed by banks generally. For very obvious reasons they are subject to regulation to the same extent as banks are. In classifying trust companies as banks, for the purpose of regulation, the legislature has acted on common knowledge that trust companies frequently do a general banking business in addition to their trust business and that many banks are doing a more or less extensive trust business. We therefore entertain no doubt that it was competent for the legislature, considering the business which trust companies are doing in this state, to define such business as banking, if it were not such in fact, and to throw around it the general safeguards provided for the banking business proper." Further citation is unnecessary. ■ It is now settled, beyond question, that the Bank Act is constitutional and that trust companies are within the express terms and subject to the regulation therein provided. And the same act makes it the duty of the Superintendent of Banks to enforce the provision thereof. At least the act confers sufficient power upon the Superintendent of Banks as would preclude an order enjoining him from "in anywise interfering with a trust company or the conduct of its busi-

ness," which is the relief here sought by plaintiff and appellant. Thus prefaced we may approach what is practically the only question presented, namely, "Does the plan of the plaintiff corporation include a trust business?" In other words, from the record before us, can the plaintiff corporation be classed as a trust company? It is evident from the record, and conceded by both of the parties hereto, that the business of appellant corporation is the sale of investment certificates such as outlined hereinbefore and the retention and investment of the proceeds as in the certificate provided. The appellant corporation stands on the claim that the plan of subscription and investment constituting its business creates a relationship of principal and agent as between the corporation and a subscriber and that no trust is created. In support of the claim many authorities are cited on the general questions of agency and trusts. Little aid comes from these citations, inasmuch as each case deals with a peculiar personal transaction affecting only the parties thereto. To follow through the varied relationships that parties may create as between themselves, and analyze and distinguish each in turn, would be a useless undertaking. Perhaps, in many of the cases cited, language is used which, standing by itself, might support the view of appellant. But it may be said, quite generally, that in every case where one delegates to another a power of representation there is necessarily some element of a trusteeship. And in every case where a trust is established there is some notion of representation implied. Therefore, rather than attempt any scientific differentiation, we content ourselves with the already accepted doctrines. Of the several uses of the term "trust," the most appropriate or accurate, perhaps, is the employment of the word to designate a formal transference of property or money for the purpose of having it held and administered by the transferee in behalf of another person. (25 Cal. Jur. 279.) A voluntary trust is an obligation arising out of a personal confidence reposed in and voluntarily accepted by one for the benefit of another. (Civ. Code, sec. 2216.) In *Estate of Shaw*, 198 Cal. 352, the court says at page 360: "As to the use of the words 'trust' or 'trustee' in an instrument it has been frequently held that there is no magic in mere words of the character and that the question as to whether or not a trust has been created by such instrument

depends upon the powers and duties with which the powers named therein have been invested. If it appears to be the intention of the parties from the whole instrument that property is conveyed to be dealt with for the benefit of another, a court of equity will affix to it the character of a trust.'' ▮ A declaration of trust or other instrument providing for the holding of property by trustees for the benefit of the owners of assignable certificates representing the beneficial interest in the property may create a trust. Whether or not it creates a trust depends upon the way in which the trustees are to conduct the affairs committed to their charge. If they act as principals, and are free from the control of the certificate holders, a trust is created. (*Frost* v. *Thompson*, 219 Mass. 360 [106 N. E. 1009].)

▮ A general rule in the law of trusts is that a trustee is a principal, and not an agent for the *cestui que trust*. In *Betta* v. *Harkathom*, 159 Ark. 621 [252 S. W. 602], it is said in substance: ''The indenture makes the trustees absolute masters of the property and business. The only right accorded to the holders of certificates of stocks is to share in the profits or dividends. They are in the attitude of one lending money to a partnership for a share of the profits in lieu of interest. A reading of the instrument in its entirety has convinced us that the shareholders are not associated with each other and the trustees for the purpose of conducting a business in person or through agents for a profit.'' The language is adopted as being applicable to the case before us. In *State* v. *Cosgrove*, 36 Idaho, 278 [210 Pac. 393], we find this language: '' . . . Business trusts have been referred to as partnerships where the shareholders retained control over the trustees and have had some authority as to the conduct of the business, but where the beneficiaries retain no control over the trustees, and are not in fact associated in the actual carrying on of the business, but are limited in interest to having the trust administered in their interest, it is held that it should be regarded as a pure trust. A business trust in which shareholders have no substantial control or management of the trust property or funds is regarded as an ordinary trust, the same as the usual testamentary trust.'' Without further quotation from authority reference is made to the following: *Home Lumber Co.* v. *Hopkins*, 107 Kan. 153 [10 A. L. R. 879, 190 Pac. 601];

*Crocker* v. *Malley*, 249 U. S. 223 [2 A. L. R. 1061, 63 L. Ed. 573, 39 Sup. Ct. Rep. 270] ; *Taylor* v. *Mayo*, 110 U. S. 330 [28 L. Ed. 163, 4 Sup. Ct. Rep. 147] ; *Liquid Carbonic Co.* v. *Sullivan*, 103 Okl. 78 [229 Pac. 561].

██ When one expresses the intention to hold the legal title, but that another should have the beneficial interest, the implication necessarily follows that the former intended to create a trust. (*Taber* v. *Bailey*, 22 Cal. App. 620 [135 Pac. 975].)

It is said by appellant: "The directors are restricted in the handling of the funds to the precise terms of the power of attorney. The corporation never owns the funds. The funds contributed never became a part of the corporation's capital. *They are just as separate as the property of an individual trust held by a trust company.*" The plan of plaintiff corporation requires title to all funds contributed to pass to the company for investment for profit. The contributors have nothing to say about the management of the company, the selection of the investments, the kind of business for which their money shall be used or the conduct of the business. These matters are committed exclusively to the board of directors, who personify the corporation and are not directly answerable to the contributors. The holder of the certificate is not a member of the corporation appellant. The corporation entity is something independent of him. He has not a share in it nor has he any interest in connection with the profits of the corporation or its conduct. The corporation might take title to the real property purchased, either in the corporate name or in the name of a nominee. From the profits, if any, the corporation retains its share specified and is under no obligation to the certificate holder save paying him what the directors see fit. The purchaser of the certificate has parted with his money and has no interest in the management of the property and the certificate contains no provision for the return of the principal sum invested, under any circumstances.

██ We conclude that the business of appellant corporation is a trust business and that the court was correct in denying any injunction restraining the said Superintendent of Banks from interfering in anywise with plaintiff or the conduct of its business. This disposes of the appeal. Other questions are interjected throughout the proceeding which

we find not necessary to determine. From the argument of appellant it would seem clear that it desires to do business in California under a plan or scheme that does not subject it to state regulation of any sort, and that to make sure of its legality it is desired that the scheme be submitted to the courts for approval. This is not a favored procedure. No question of public interest is involved nor has any active or actual controversy arisen which calls for a declaration of rights.

The general laws make ample provision for the classification of all business enterprises and provide sufficient remedies where rights of business or property are being invaded or endangered. If the courts should be made convenient clearing stations where, at the outset, each financial scheme or enterprise might, on the demand of its sponsor, be analyzed and labeled, the entire plan of supervision and regulation would amount to naught.

Judgment affirmed.

Knight, Acting P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 18, 1929, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 15, 1929.

All the Justices concurred.