[S. F. No. 17006. In Bank. Aug. 27, 1946.]

CALIFORNIA PHYSICIANS' SERVICE (a Nonprofit Corporation), Respondent, v. MAYNARD GARRISON, as Insurance Commissioner, etc., Appellant.

Robert W. Kenny, Attorney General, T. A. Westphal, Jr., and Harold B. Haas, Deputies Attorney General, for Appellant.

Hartley F. Peart and Howard Hassard for Respondent.

Musick, Burrell & Pinney, Howard Burrell and Anson B. Jackson, Jr., as Amici Curiae on behalf of Respondent.

EDMONDS, J.—California Physicians' Service, a non-profit corporation (Civ. Code, §§ 593-605e), sued to obtain a declaratory judgment that it is not engaged in the business of insurance within the meaning of the regulatory statutes of this state. The Insurance Commissioner has appealed from a determination adverse to his contentions, and the principal question for decision concerns the organization's right to operate, without his supervision, for the purpose of defraying the expense of medical care incurred by its dues-paying members.

The stipulation by which the evidence in the case was presented to the trial court shows the following facts:

The corporation was organized by the medical profession in 1939 to meet the need of persons in the lower income groups for medical care and surgical service. It holds a certificate of compliance with the provisions of section 593a of the Civil Code, relating to health service corporations, issued by the

State Board of Medical Examiners. The incorporators were all officers and councilors of the California Medical Association, an association comprising over 5,000 doctors of medicine practicing in the State of California and constituting a component state unit of the American Medical Association. The service is a pioneer attempt by the physicians and surgeons of California to make available medical care for those who desire it and, because of financial limitations, find the cost of sickness a burden not easy to bear.

The articles of incorporation state that the organization was formed "after more than ten years of continuous investigation and study." As a summary of policies and purposes, it is said "that the duties and obligations of the profession are not only leadership in the maintenance of high standards of medical service but also in the means of distribution of that service so that all who need it may receive it; that the very advances made by modern science have greatly increased the cost of good medical service and hospital care and will continue to increase that cost as new methods and equipment for diagnosis and treatment are discovered and perfected . . .; . . . that a method which only the medical profession can most effectively provide is necessary properly to distribute this cost of medical service so as to relieve the intolerable financial burden heretofore falling on the unfortunate few in any given period of time; that the establishment by the profession of a voluntary medical service plan, participated in by all doctors of medicine desiring to do so, will enable the people of the State of California to obtain prompt and adequate medical attention and hospital care whenever needed on a periodic budgeting basis without injury to the standards of medical service, without disruption of the proper physician-patient relation and without profit to any agency, and will assure that all payments made by patients, except administrative costs, will be utilized for medical service and hospital care and not otherwise; that such a plan will create an efficient public and civic service without commercial exploitation of the patients or the profession or any restriction of an individual's fundamental right freely to select, when his need arises, the doctor of medicine and hospital desired by him; and finally, such a coordinated organized service can, upon the same fundamental basis, be the means which governmental agencies—federal, state, and local—may use to provide, at the lowest possible cost to the taxpayer, good medi-

cal service and hospital care for the indigent, needy or handicapped residents of California. . . .''

To make effective these broad objectives, the by-laws declare that every resident doctor of medicine who holds ''a valid and unrevoked physician's and surgeon's certificate issued to him by the Board of Medical Examiners of the State of California shall be invited by the board of trustees to become a professional member . . . it being one of the fundamental purposes of this corporation that professional membership . . . shall embrace all legally licensed Doctors of Medicine. . . .'' The professional members select, on a basis of state-wide representation, the administrative members, limited to 75, each of whom must be an active member in good standing of the California Medical Association. The voting rights in the corporation are vested in the administrative members exclusively. They elect the trustees.

The persons who are to receive medical attention from the professional members ''on a periodic budgeting basis'' are termed beneficiary members. They are individually enrolled pursuant to a contract entered into by the service on behalf of the professional members with a lodge, professional organization, social club, or other group having a means of collecting monthly dues required to be paid for each person desiring to be included in the corporation's plan for beneficiary membership, or with an employer who will agree to deduct membership fees from the payroll. A basic requirement for each contract is that a specified minimum percentage of the group, or of the employees, enroll as members and agree to pay the monthly membership dues. Only persons whose compensation is less than $3,000 per annum may enroll. In April, 1941, the service had 25,378 beneficiary members and in June of the same year, the enrollment of new beneficiary members was increasing at the rate of approximately 1,500 members a month. Upon the basis of these figures, total membership now exceeds 100,000.

A registration fee is charged by the corporation at the time of application for a beneficiary membership and the association or employer agrees that it will pay, or cause to be paid to the service, if the agreement is for full coverage medical and surgical service only, the sum of $1.70 per month for each male person and $2.00 per month for each female person affiliated with the group who has become a beneficiary member.

More specifically, the contract, known as the Group Medical Service Agreement, entered into between California Physicians' Service, using the abbreviation C.P.S., and various organizations, provides:

"It is understood that C.P.S. is acting as the agent of said group and of those of its members, associates or employees, as the case may be, who become and remain beneficiary members in C.P.S. (who are hereinafter referred to as the members) for the purpose of securing to said members medical services through professional members of C.P.S. It is understood that hospital care may be obtained through non-profit hospital service corporations operating pursuant to Chapters 9 or 11A of Part II, Division II, of the Insurance Code of the State of California. It is further understood that C.P.S. is not obligated to any of said members or to the group except as may be herein provided, and then only upon continued compliance by the group and said members with the conditions herein stipulated.

"Each beneficiary member of C.P.S. shall be entitled, during the times that he is such a beneficiary member, subject to the articles of incorporation, by-laws and rules and regulations of C.P.S. as now existing or as may be from time to time amended, to secure when needed and for a period of not to exceed one (1) year for any one illness or injury, medical and surgical services from those doctors of medicine in the State of California who are professional members of C.P.S. . . .

"The services which are offered to those persons in the group who become beneficiary members of C.P.S. are offered personally to said members by the professional members of C.P.S., and the right of said members to receive the same is not transferable.

"In presenting the various offers herein contained, C.P.S. acts only as the agent of its professional members and assumes no liability for the breach of any one or all of the obligations undertaken by its professional members. In no case is C.P.S. an insurer against or liable for the negligence of any of its professional members or the negligence of any hospital or any hospital service corporation from which its beneficiary members may have obtained hospitalization or the negligence of any other person.

"The amounts to be paid by the group, as herein specified,

are accepted by C.P.S. and its professional members as full payment and compensation for all medical and surgical services rendered during the immediately preceding dues period, and they and each of them agree to perform the services herein included, without other, further or additional charge of any kind whatsoever to those beneficiary members who are affiliated with the group and have an annual family net income (for state income tax purposes) of $3000.00 or less. . . ."

The Rural Health Service Agreement which the corporation made with the Farm Security Administration, an agency of the United States, contains substantially the same terms as those of the Group Medical Service Agreement, but there are additional provisions for hospitalization and reimbursement for drugs. Although the preamble of this agreement states that it is of an experimental nature and binding only for a specified period, the stipulation of facts recites that it "has been adopted by California Physicians' Service and is in use at the present time."

By this contract, families accepted by the Farm Security Administration and having an annual income of less than $2,000 may be enrolled as beneficiary members upon payment of specified amounts, ranging from $30 to $60 per year. Medical care is made available only to those who are eligible for loans from the Farm Security Administration. A further requirement, subject to waiver by the Service, is that the agreement shall be effective only if applications are made by at least 50 per cent of the borrowers from the agency in any one administrative area, with a minimum membership of 70 for such a territory.

The Service, acting as agent for professional members and hospitals, "does not covenant to secure participating hospitals" but agrees to "use its best efforts so to do." Each beneficiary member is entitled, upon the certification of the medical director of the service, to hospitalization for not more than ten days annually. Under specified conditions the cost of necessary drugs prescribed by a professional member will be paid by the corporation. No contract with a hospital is in evidence but the Rural Health Service Agreement, at least impliedly, defines a participating hospital as one which has agreed to accept payment, upon a unit basis, solely from the pool of membership dues.

Each professional member agrees, by written contract with the corporation, to render such needed medical attention to

beneficiary members as may properly be requested of him and, for the payment of compensation for such services, to look solely to the available funds of the organization. But every physician "is free to exercise his individual right to refuse to accept any person as a patient." The amount to be paid to a physician is determined by what is known as a unit system, and each professional member agrees to accept as payment in full for his services rendered to beneficiary members during each month, a pro rata distribution of that portion of dues collected during such month.

The by-laws describe the unit system and its operation as follows: "By the term 'unit system' is meant a method of computing the compensation due to professional members rendering medical or surgical services whereby a proportional valuation is set upon each kind of service by counting each such service as a determined number of units by resolution of the board of trustees adopting a schedule or schedules of compensation. The total sum of money available for compensation of professional members is divided by the total number of units of service rendered during any given period to determine the monetary value of a single unit for the purpose of compensation earned by professional members and each professional member is paid according to the number of units of service he has rendered in said period. . . .

"In the event that during any period there is available for payment to professional members a sum in excess of the sum necessary to pay the full schedule or compensation established by the board of trustees, such excess sum shall be reserved by the board of trustees as a part of the reserve funds of the corporation, or, if the board of trustees so determines, it may be distributed on a unit system to those professional members who have in any prior period determined by the board received for their services less than the compensation schedule, provided no professional member shall thereby receive more than the full compensation schedule for any service rendered."

Upon this evidence the trial court decreed as follows:

"That rendition of medical and surgical services by the professional members of . . . California Physicians' Service, and the acceptance of payment for such services . . . from funds contributed by the beneficiary members" of the organization "does not constitute the transaction of an insurance

business under the insurance laws'' of this state. More generally the court declared that the ''objects and purposes set forth in the articles of incorporation'' of the Service ''are lawful objects and purposes and the performance or undertaking by plaintiff of any or all of said objects does not and will not violate any . . . laws of the State of California relating to the business of insurance.'' Concerning the medical attention which the members receive, the decree recites that ''the rendition of medical and/or surgical services . . . does not constitute a violation of the principle that a corporation may not engage in or be licensed to practice one of the learned professions. . . .'' But the court declared that the collection of money ''to be used in the manner and for the purposes outlined in the articles of incorporation of the plaintiff'' subjects it to regulation by the Attorney General of California in accordance with the provisions of section 605(c) of the Civil Code relating to nonprofit corporations.

As grounds for reversal of the judgment, the Insurance Commissioner declares that the courts should not place judicial approval upon a controversial type of new business enterprise; also that, in the absence of specific statutory authority for declaratory relief against the state or an officer of the state, such an action cannot be maintained. The term ''person'' as used in section 1060 of the Code of Civil Procedure, it is urged, does not include the state or its officers because general words in a statute which might have the effect of restricting governmental powers are to be construed as not applying to the state, and declaratory relief is not available against political subdivisions of the state.

Another contention of the commissioner is that the Service's activities constitute the unlawful practice of medicine by a corporation. Furthermore, he says, section 593a of the Civil Code specifying certain minimum requirements which a health service corporation must meet, and a statute authorizing political subdivisions of the state and public agencies to contract with a nonprofit membership corporation for medical service (Stats. 1939, ch. 250; 2 Deering's Gen. Laws, Act 3725) are invalid. These enactments, it is claimed, make an unreasonable classification because the grant of the privilege of corporate practice, based upon the number of licensee members of the corporation, is not related to qualification or fitness. Also, the argument continues, no subsequent legislation has authorized the activities of the Service.

The major ground for the attack upon the judgment is that the Service is engaged in the business of transacting insurance and, therefore, is subject to the regulatory laws governing such corporations. All of the elements of insurance are present in the Service's plan, says the commissioner. There is no real distinction between service and insurance, and by its contracts the corporation has obligated itself to furnish medical care. The Service's plan of operation is not excepted by statute from the supervision of the insurance department, and the Service is not a consumer cooperative, but a corporation organized for the profit of the professional members. The nature of the medical service, and of the contracts it offers, require the application of the insurance laws to its affairs in order to prevent exploitation of the public. Finally, the commissioner asserts, the judgment goes beyond the stipulated facts in prospectively validating future acts not comprehended in the Service's plan of operations as conducted at the time the decree was entered, and its method of doing business since the notice of appeal was filed shows the necessity for state insurance regulation.

In response to the contentions of the attorney general the Service asserts that declaratory relief is a proper form of action against the Insurance Commissioner. Also, it replies, the Service is not engaged in the corporate practice of medicine; if so, its functions are expressly permitted by statute.

Turning to the most important question, the Service declares that it is not engaged in the insurance business but is rendering personal service, as distinguished from indemnity, compensation for which is limited to the resources of a pooled fund; that the professional members, not the Service, assume any and all risk; and that it is actually a producer-consumer cooperative. Furthermore, the Service concludes, as a matter of social policy the state, by statute, has declared that a nonprofit membership corporation may lawfully defray or assume the cost of medical and surgical services or render any such service. In that regard, the argument runs, the Legislature has necessarily determined that the rendition of medical and surgical services by a nonprofit membership corporation coming within the purview of section 593a of the Civil Code does not constitute that type of insurance, assuming it is insurance, which is subject to regulation by the Insurance Commissioner. In conclusion, the Service maintains that the

legislative classification under the applicable code provisions is constitutional.

■ This court has recently held that section 1060 of the Code of Civil Procedure sanctions a declaratory judgment against a political subdivision of the state. Certainly, where a government body is subject to suit, such a procedural statute does not interfere with rights of sovereignty. (*Hoyt* v. *Board of Civil Service Com'rs*, 21 Cal.2d 399, 403 [132 P.2d 804].)

■ The Insurance Commissioner is authorized to "prosecute and defend any and all suits and other legal proceedings." (Ins. Code, § 1037(f).) There is no substantial difference between this language and the expression which is generally used in statutes waiving sovereign immunity as to cities and counties; the accepted declaration of such enactments is that they may "sue and be sued." (Deering's Gen. Laws, 1937, Act 5233, §§ 19 et seq.; Pol. Code, § 4003; and see the numerous municipal charters.) And as stated in *Hoyt* v. *Board of Civil Service Com'rs, supra,* page 404, "there is no reason why the statute [empowering a political subdivision to sue or be sued] should not be interpreted so as to authorize the determination by that [declaratory relief] procedure of any issue which might be determined . . . in an ordinary action at law or in equity." Tested by these principles, a determination as to whether the Service's activities subject it to regulation under the insurance laws does not trench upon rights of sovereignty.

The present suit is also analogous to the situation presented in *County of Los Angeles* v. *Riley*, 20 Cal.2d 652 [128 P.2d 537], where the court said that an action to compel an officer to perform a duty expressly enjoined upon him by law, although considered a suit against the state, does not offend the sovereign immunity principle. (See, also, *Brock* v. *Superior Court*, 11 Cal.2d 682 [81 P.2d 931]; *City of Oakland* v. *Brock*, 8 Cal.2d 639 [67 P.2d 344]; *U'Ren* v. *State Board of Control*, 31 Cal.App. 6 [159 P. 615]; *Kingsbury* v. *Nye*, 9 Cal.App. 574 [99 P. 985]; *Board of Directors* v. *Nye*, 8 Cal.App. 527 [97 P. 208]; 23 Cal.Jur. 583.) The decisions relied upon by the attorney general (*Balthasar* v. *Pacific Elec. Ry. Co.*, 187 Cal. 302 [202 P. 37, 19 A.L.R. 452]; *Bayshore Sanitary Dist.* v. *San Mateo County*, 48 Cal.App.2d 337 [119 P.2d 752]; *Irvine* v. *Sacramento etc. Drain. Dist.*, 49 Cal.App.2d 707 [122 P.2d 320]; *Lossman* v. *City of Stockton*, 6 Cal.App.2d 324 [44 P.2d 397]) holding that the term "person" as used in section 1060 of the Code of Civil Procedure does not include the state or

any of its political subdivisions were expressly disapproved in the Hoyt case.

Other cases cited for the proposition that declaratory relief will not be used to give a controversial type of enterprise judicial approval (*Hayden Plan Co.* v. *Friedlander,* 97 Cal. App. 12 [275 P. 253]; *Hayden Plan Co.* v. *Wood,* 97 Cal. App. 1 [275 P. 248]) were decided upon the basis of an absence of a question of public interest, the lack of an actual controversy, and an adequate remedy under the general laws. In the present litigation, the stipulation of facts shows an actual controversy between the parties relating to their respective legal rights and duties, and the issue is of great public interest. ▉ Whether a determination is necessary and proper is a matter within the discretion of the trial court, and in the absence of a clear showing of abuse of that discretion, which does not appear here, its decision will not be disturbed upon appeal. (Code Civ. Proc., § 1061; *Moss* v. *Moss,* 20 Cal.2d 640 [128 P.2d 526, 141 A.L.R. 1422]; *Cutting* v. *Bryan,* 206 Cal. 254 [274 P. 326]; *Simpson* v. *Security-First Nat. Bank,* 71 Cal.App.2d 154 [162 P.2d 494].) Moreover, section 1062 of the Code of Civil Procedure expressly provides that the remedy through declaratory relief is cumulative and not restrictive of any other remedy provided by law. (See *Gunn* v. *Giraudo,* 48 Cal.App.2d 622, 630 [120 P.2d 177]; *Wollenberg* v. *Tonningsen,* 8 Cal.App.2d 722, 726 [48 P.2d 738].)

▉ Considering the merits of the case, it is a matter of common knowledge that there is great social need for adequate medical benefits at a cost which the average wage earner can afford to pay. Unquestionably the distribution of these services has lagged far behind production. During the past several decades many plans have been devised to distribute the cost of medical care (see *People* v. *Pacific Health Corp.,* 12 Cal.2d 156 [82 P.2d 429, 119 A.L.R. 1284]; *Butterworth* v. *Boyd,* 12 Cal.2d 140 [82 P.2d 434, 126 A.L.R. 838]; *Pacific Employers Ins. Co.* v. *Carpenter,* 10 Cal.App.2d 592 [52 P.2d 992]; 52 Harv.L.Rev. 809-817) and in 1917, the California Legislature adopted a constitutional amendment calling for the creation of a system of state medicine financed through taxation (Stats. 1917, p. 1948). This amendment was rejected by the people.

▉ In 1935, similar legislation met defeat. The medical profession then undertook the responsibility for providing medi-

cal service on an ability-to-pay-for basis, and it is obvious that the Legislature, by enacting section 593a of the Civil Code,[1] expressly authorized the organization of corporations such as California Physicians' Service. By this enactment, the state's social policy in regard to the corporate practice of medicine, to the limited extent specified, has been determined and the courts are bound thereby. (See *People* v. *Pacific Health Corp., supra,* p. 161; *Pacific Employers Ins. Co.* v. *Carpenter, supra,* p. 602; 52 Harv.L.Rev. 809-817; 25 Cal.L.Rev. 91-98; 53 Yale L.J. 162-182.) It is stipulated that the Service has complied with the provisions of this statute and holds a certificate in the form authorized by its provisions.

 The statutory provisions authorizing the Service's operations do not violate article IV, section 25, subdivision 19, of the California Constitution which prohibits "granting to any corporation, association, or individual any special or exclusive right, privilege, or immunity." As stated in *Livingston* v. *Robinson,* 10 Cal.2d 730, 740 [76 P.2d 1192]: "The question of classification is generally one for the legislative power, to be determined by it in the light of its knowledge of all the circumstances and requirements, and its discretion will not be overthrown unless it is palpably arbitrary. (*Wores* v. *Imperial Irr. Dist.,* 193 Cal. 609 [227 P. 181].) It will be presumed that the legislature made inquiry to determine whether or not there were evils to be remedied and that the

---

[1] "Sec. 593a. (Health service corporations: Prerequisites to commencement of business: Supervision.) A nonprofit corporation may be formed under this article for the purposes of defraying or assuming the cost of professional services of licentiates under any chapter of Division 2 of the Business and Professions Code or of rendering any such services but it may not engage directly or indirectly in the performance of the corporate purposes or objects unless:

"(1) At least one-fourth of all licentiates of the particular profession become members;

"(2) Membership in the corporation and an opportunity to render professional services upon a uniform basis is available to all licensed members of the particular profession;

"(3) Voting by proxy and cumulative voting are prohibited; and

"(4) A certificate has been issued to the corporation by the particular professional board, whose licentiates have become members, finding compliance with the foregoing requirements.

"Any such nonprofit corporation shall be subject to supervision by the particular professional board under which its members are licensed and shall also be subject to the provisions of Section 605c of this code. This section, except as expressly permitted herein, does not authorize the formation of any corporation for the purpose of rendering the professional services regulated by Division 2 of the Business and Professions Code. (Added by Stats. 1941, ch. 629, § 1.)"

classification made was based upon the result of the inquiry." And in *People* v. *Western Fruit Growers,* 22 Cal.2d 494, 507 [140 P.2d 13], it was said: "When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification." (See, also, *Gillum* v. *Johnson,* 7 Cal.2d 744, 759 [62 P.2d 1037, 63 P.2d 810, 108 A.L.R. 595] ; *State Bar* v. *Superior Court,* 207 Cal. 323, 332 [278 P. 432] ; *People* v. *Keith Ry. Equip. Co.,* 70 Cal.App.2d 339, 356, 357 [161 P.2d 244].) ▇ The Legislature may classify organizations rendering medical services under the same general principles as those which allow it to license for numerous occupations and professions and public policy certainly permits restriction of the right to assume the cost of such services to such organizations as meet reasonable and definite standards. The interest of the state in the health of its citizens (see *Butterworth* v. *Boyd, supra*) fully justifies the legislative classification. The decision relied upon by the attorney general, *Van Camp Sea Food Co., Inc.* v. *Newbert,* 76 Cal.App. 445 [244 P. 946], to support his conclusion is in accord with these general principles but is factually distinguishable.

▇ Considering the question as to the supervision which the state has imposed upon corporations such as the Service, the Legislature has defined insurance as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22; Civ. Code, § 2527.) Disability insurance "includes insurance appertaining to injury, disablement or death resulting to the insured from accidents, and appertaining to disablements resulting to the insured from sickness." (Ins. Code, § 106.) Under chapter 4 (§ 10272) of the Insurance Code, which deals with standard provisions in disability policies, "indemnity" is said to mean "benefits promised"; while in the Civil Code, section 2772, it is defined as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." Otherwise stated, "insurance generally may be defined as an agreement by which one person for a consideration promises to pay money or its equivalent, or to perform some act of value, to another on the destruction, death, loss,

or injury of someone or something by specified perils.'' (29 Am.Jur. 47.)

These definitions clearly state the basic concepts or elements which are a necessary prerequisite of a contract of insurance. ''Whether the contract is one of insurance or of indemnity,'' said one court, ''there must be a risk of loss to which one party may be subjected by contingent or future events and an assumption of it by legally binding arrangement by another. Even the most loosely stated conceptions of insurance and indemnity require these elements. Hazard is essential and equally so a shifting of its incidence. If there is not risk, or there being one it is not shifted to another or others, there can be neither insurance nor indemnity. Insurance also, by the better view, involves distribution of the risk, but distribution without assumption hardly can be held to be insurance.'' (*Jordan* v. *Group Health Ass'n,* 107 F.2d 239, 245; see, also, *Fageol T. & C. Co.* v. *Pacific Indemnity Co.,* 18 Cal. 2d 731 [117 P.2d 661]; *Gregg* v. *Com'r of Corp. & Tax.,* 315 Mass. 704 [54 N.E.2d 169, 150 A.L.R. 1280]; *Commissioner of Banking & Insurance* v. *Community Health Service, Inc.,* 129 N.J.L. 427 [30 A.2d 44]; *Stern* v. *Rosenthal,* 71 Misc. 422 [128 N.Y.S. 711]; *State* v. *Universal Service Agency,* 87 Wash. 413 [151 P. 768, Ann.Cas. 1916C 1017]; 53 Yale L.J. 172; 23 Corn.L.Q. 188, 193; 119 A.L.R. 1241; 100 A.L.R. 1449; 63 A.L.R. 711; Vance, Insurance (2d ed.), p. 57.) Although some authorities have held that to constitute insurance the so-called insured must be indemnified by the payment of money (*Jordan* v. *Group Health Ass'n, supra,* p. 245, note 13; *Moresh* v. *O'Regan,* 120 N.J.Eq. 534 [187 A. 619]; 5 Elliott, Contracts, § 4020), or that statutes regulating insurance were intended to apply only to concerns organized for profit and not to charitable or nonprofit associations (*Hall D'Ath* v. *British Provident Assoc.* (1932), 48 Times L.R. 240; *State* v. *Taylor,* 56 N.J.L. 49 [27 A. 797]), there are more substantial reasons upon which to base a determination as to the status of the California organization.

 The business of the Service lacks one essential element necessary to bring it within the scope of the insurance laws, for clearly it assumes no risk. Under the provisions of the contracts or group agreements, it is a mere agent or distributor of funds. It does not promise the beneficiary members that it will provide medical care; on the contrary, ''the services which are offered to . . . beneficiary members of C.P.S.

are offered personally to said members by the professional members of C.P.S. . . ." (See *Jordan* v. *Group Health Ass'n, supra,* p. 246; *Phez Co.* v. *Salem Fruit Union,* 103 Ore. 514 [201 P. 222, 205 P. 970, 25 A.L.R. 1090].) The professional member is compensated for his services solely from the fund created by the monthly dues of the beneficiary members. Payments from the fund are made to the physicians pro rata in accordance with an established schedule. Under that plan, the amount of compensation of the professional members is variable and may be high or low, depending upon the incidence of sickness and the number of beneficiary members paying dues. Stated in terms of insurance, all risk is assumed by the physicians, not by the corporation, hence the only effect of requiring compliance with regulatory statutes would be to compel the acquisition of reserves contrary to the established method of operation. (See *Jordan* v. *Group Health Ass'n, supra,* p. 251.)

This distinction has been recognized and applied by other courts which have considered the same question. In *Jordan* v. *Group Health Ass'n, supra,* the organization which distributed funds for medical care sought a declaration of its status under the laws of the District of Columbia which define insurance in substantially the same terms as the California statutes.[2] The corporate purpose of the association[3] and its method of doing business was similar to that of California Physicians' Service.[4] The court held that the corporation

---

[2]Sec. 653 of the code, D. C. Code 1929, tit. 5, sec. 179, provides: "Every corporation, joint-stock company, or association not exempt herein, transacting business in the District of Columbia, which collects premiums, dues, or assessments from its members or from holders of its certificates or policies, and which provides for the payment of indemnity on account of sickness or accident, or a benefit in case of death, shall be known as 'health, accident, and life insurance companies or associations.' " (P. 244.)

[3]The corporate purposes, summarized, were to provide, without profit to the corporation, medical services, preventive and curative, surgery, hospitalization and medical and surgical supplies to members of Group Health and their dependents. (P. 241.)

[4]Members composed of civil service employees of the executive branch of the federal government were selected by Board of Trustees, who in turn were elected by the members except two who were chosen by the Federal Home Loan Bank. Control and management of corporate affairs was vested in the trustees. Group Health issued no policies, formal certificates or contracts, but did give membership cards to its members for purposes of identification. Members' rights to services are fixed by the certificate of incorporation and the by-laws. In return for monthly dues, Group Health undertakes to arrange for hospital service and for medical and surgical services to be rendered by independent

had assumed no risk.[5] This conclusion applies more exactly

practitioners, who received fixed annual compensation paid in monthly installments. Both physician and hospitals looked solely to the corporation for their compensation.

The pertinent provisions of the by-laws of Group Health provided as follows: ''The Board of Trustees shall contract for and in behalf of the members of this corporation, with physicians duly licensed to practice their profession in the District of Columbia, who shall render such service to the members as may be provided in said contract. . . . The Board of Trustees shall in no way regulate or supervise the practice of medicine by any physician with whom it contracts for the care of members. . . . The corporation does not guarantee that it will provide any or all of the services above specified and for which it will attempt to contract on behalf of its members and it shall not be liable to any member or his dependent in any manner whatever if it should for any reason, including lack of funds, be unable to procure any or all of said services when called upon to do so. The corporation does not guarantee that any physician or physicians with whom it may enter into a contract to render services to its members will perform such contract and its only obligation in the event of the breach of such contract by any physician shall be to use its best efforts to procure the needed services from another source. The corporation shall not be liable to its members or their dependents for any act of omission or commission on the part of physicians or other persons with whom it may contract for the rendition of services to its members and their dependents.'' (P. 243.)

[5]The court in the Jordan case, *supra,* in discussing the problem of assumption of risk said:

''But what of the service to the sick or injured? Here certainly is risk, hazard which has descended. But has it shifted to or assumed by Group Health? On this question the exact nature of its obligation becomes important. Does it assume the risk, or contract to bear the member's loss when it falls? . . . Unless the by-laws are to be discarded and ignored entirely there can be only one answer. The agreement is not to pay the member or to any one else the *amount of loss* which is caused to him. True, the physician receives his salaried compensation. But he receives no more and no less because of the falling of the loss. He is not a beneficiary . . . in an inaccurate, nontechnical sense, he, rather than Group Health, is the one more nearly analogous to an insurer. If incidence of illness in the group is light, so is his work; if heavy, so is his labor up to the maximum of his contract. In either case the compensation is the same. Nor is the burden of Group Health increased normally by the falling of particular losses. Its obligation to the physician remains the same. That to particular members is not at all affected by the volume of illness in the group whether great or small. . . . In any event, whatever the emergency or the experience, it undertakes not to supply the service, or see or guarantee that it is supplid, or be responsible for the failure to supply it or to do so properly, but only to 'use its best efforts' to secure similar services from another source. . . .

''Tested by the nature of the member's right of recourse against Group Health for breach of its contract with him, the matter becomes clear. Possibly he could succeed on showing no reasonable effort by it to contract with physicians or others to render the stated services; or that it was negligent in selecting incompetent ones; or that it did not 'use its best efforts' to make alternative arrangements. But barring some such showing, his attempt to recover would be in the teeth of his contract. This is not assumption of risk or hazard. It has not the sound or the sense, technically or in lay conception, of 'insurance' or of 'indemnity.'

to the California organization because of the total lack of a promise by the corporation to the beneficiary members to render any medical care. Except for the limited hospitalization obtainable by rural members in connection with the Farm Security Administration contract, the Service does not even promise to "use its best efforts to procure the needed services" as the District of Columbia corporation agreed to do, and does not obligate itself to pay the physicians a certain sum per month. The California physicians look solely to the monthly dues of the beneficiary members for compensation.

The case of *State* v. *Universal Service Agency*, 87 Wash. 413 [151 P. 768, Ann.Cas. 1916C 1017], relied upon in the Jordan case, *supra,* page 249, was an action by the Insurance Commissioner to forfeit the corporate franchise of the organization upon the ground that it was "doing an insurance business without complying with the statutes regulating the doing of such business." The applicable definition of insurance was similar to, if not identical with, that of this state,[6] and the method of doing business was the same as that of the California Physicians' Service,[7] including the type of contract used.[8] And again the want of assumption of any hazard or

If it resembles anything, the analogy is rather to 'agency' or representative action, or to that of an intermediary of more independent status. Then the contract is, in fact, unique. It does not fit neatly into established categories of 'agency,' 'guaranty,' 'insurance,' 'indemnity' and the like. As has been said, it bears some relation to a collective labor agreement. In a broad sense, such an agreement may be considered as one of 'indemnity' against unemployment or other hazards covered by its terms. Yet no one would contend that because the employer fails to live up to his contract with the union, it would be rendered liable to its member injured by his breach, or that the union, because it makes contracts to this extent on behalf of and for the benefit of its members, becomes as to them an 'insurer' or 'indemnifier' against the risk of such a contingency. . . ." (Pp. 246, 247.)

[6]Wash. Ins. Code, sec. 1 (Laws 1911, c. 49) defines insurance as "a contract whereby one party called the 'insurer,' for a consideration, undertakes to pay money or its equivalent, or to do an act valuable to another party called the 'insured,' or his 'beneficiary,' upon the happening of the hazard or peril insured against whereby the party insured or his beneficiary suffers loss or injury." (P. 772.)

[7]The Universal Service Agency, the corporation, made its agreements with members or "subscribers" and with physicians, pharmacists and others on elaborate forms drawn on an "agency" theory. The physician's compensation was a specified share of each member's payments, to be paid over to him within a stated time following receipt by the Agency. (Pp. 769-771.)

[8]The contract or agreement between the corporation and the physician was in the following form:

risk was the basis for holding that the corporation was not engaged in the insurance business.

In the case of *Commissioner of Banking & Insurance* v. *Community Health Service, Inc.*, 129 N.J.L. 427 [30 A.2d 44], the Insurance Commissioner sued the defendant corporation to recover a statutory penalty for conducting an unlicensed insurance business. The corporation had made contracts with licensed physicians under which they agreed to render professional services for a certain stipulated compensation to those members of the general public who paid the corporation a specified sum each month. The physicians' services were engaged by the corporation for a period of one year, and from year to year thereafter, for a fixed consideration which varied with the number of contract holders but not with the amount of service rendered by the physician to any or all of the contract holders. The court, relying upon *State* v. *Universal Service Agency, supra,* and *Stern* v. *Rosenthal,* 71 Misc. 422 [128 N.Y.S. 711], held that the corporation was not engaged in the business of insurance because, as between the corporation and the physician, nor between the physician and the subscriber, was the compensation or any other element of the arrangement between them affected by any contingency, hazard or risk which the corporation assumed and

"... the ... [corporation] ... proposes to act as agent of various persons in securing for them certain privileges and benefits, and, among other things, desires to procure to said various persons reduced rates for medical services and to act as agent for certain physicians in collecting fees: (P. 769.)

"... the ... [physician] ... agrees to contract directly with the holder to furnish the services herein specified; that the ... [corporation] ... has no interest therein except to secure acceptance of the offer herein made by the ... [physician] ... and to collect from such persons the fees herein specified for the use and benefit of ... [physician]. ... And the ... [corporation] ... assumes no liability for any negligence, lack of professional skill, or failure of attention to any or all persons accepting the offer herein contained, and that the ... [physician] ... does hereby assume all liability that may be incurred by any negligence or lack of professional skill to the holder of the contract herein offered." (P. 770.)

The pertinent provisions of the agreement between the purchaser of the service or beneficiary member and the corporation provided: "V. In presenting the various offers herein contained the Agency acts only as the agent of the parties and assumes no liability for the breach of any one or all of said contract. The Agency agrees, however, that in the event of a breach, it will use its best efforts to procure other persons or firms to offer the same or similar service.

"VI. ... but in no case, is it an insurer against the negligence of any physician or pharmacist offering services or benefits herein." (P. 771.)

insured against. (See, also, *Vredenburgh* v. *Physicians' Defense Co.*, 126 Ill.App. 509; *State* v. *Laylin,* 73 Ohio St. 90 [76 N.E. 567]; 53 Yale L.J. 172.)

In both the Jordan case, *supra,* and in *State* v. *Universal Service Agency, supra,* as is true in the present case, reliance was placed upon *Physicians' Defense Co.* v. *O'Brien,* 100 Minn. 490 [111 N.W. 396], *Physicians' Defense Co.* v. *Cooper,* 199 F. 576 [118 C.C.A. 50, 47 L.R.A.N.S. 290], and *State* v. *Globe Casket & U. Co.,* 82 Wash. 124 [143 P. 878, L.R.A. 1915B 976]. The Physicians' Defense cases involved contracts to supply legal service to physicians in malpractice suits; the latter one concerned an agreement for burial expense. But in each of those cases there was a contract providing indemnity against a hazard which might cause loss to the corporation and, for that reason, the decisions are not here in point.

There is another and more compelling reason for holding that the Service is not engaged in the insurance business. Absence or presence of assumption of risk or peril is not the sole test to be applied in determining its status. The question, more broadly, is whether, looking at the plan of operation as a whole, "service" rather than "indemnity" is its principal object and purpose. (*Jordan* v. *Group Health Ass'n, supra,* pp. 247 et seq.; see *Vredenburgh* v. *Physicians' Defense Co., supra,* p. 513; *State* v. *Laylin, supra,* p. 98; *Commonwealth* v. *Provident Bicycle Ass'n,* 178 Pa. 636, 642 [36 A. 197, 36 L.R.A. 589]; *Sisters of Third Order of St. Francis* v. *Guillaume,* 222 Ill.App. 543; 3 Univ. of Pittsburgh L.Rev. 250; 52 Harv.L.Rev. 814, 815; 23 Corn.L.Q. 188; 29 Mich.L.Rev. 378; Vance, Insurance, p. 61.) Certainly the objects and purposes of the corporation organized and maintained by the California physicians have a wide scope in the field of social service. Probably there is no more impelling need than that of adequate medical care on a voluntary, low-cost basis for persons of small income. The medical profession unitedly is endeavoring to meet that need. Unquestionably this is "service" of a high order and not "indemnity."

The fact that the rural Health Service Agreement provides for limited hospitalization does not make the business of the service that of insurance. So far as the record shows, a participating hospital may look only to the pooled fund of the service for payment for facilities furnished to a beneficiary member. Also, the additional features of hospitalization and

reimbursement for drugs are not distinguishable from other medical care obtainable on the group basis, and they are merely incidental to the plan or scheme as a whole. (See *Jordan* v. *Group Health Ass'n, supra,* p. 244, note No. 10.)

Furthermore, the Legislature by the enactment of section 593a of the Civil Code, with its express provision for limited regulation of nonprofit organization of a professional character by the attorney general and the particular professional board, necessarily intended that such organization should be exempt from regulation by the Insurance Commissioner. (See 52 Harv.L.Rev. 816; 53 Yale L.J. 171 et seq.) One of the reasons behind the declaration of the earlier cases that it was against public policy for a corporation to engage in the practice of medicine was because the control of its activities was placed in the hands of laymen. (See *Pacific Employers Ins. Co.* v. *Carpenter, supra; Painless Parker* v. *Board of Dental Exam.,* 216 Cal. 285, 296 [14 P.2d 67] ; 52 Harv.L. Rev. 811; 53 Yale L.J. 170.) To allow the Insurance Commissioner to impose the extensive regulations provided for in the Insurance Code upon the activities of the service would result in the same evil. (See 53 Yale L.J. 171.) Since section 593a of the Civil Code is applicable to the organization whose status is here under attack, it must be presumed that the Legislature weighed this evil against possible exploitation of the public and concluded that the limited regulation provided by the new statute was sufficient. Also, it may be noted, section 433.6 of the Political Code dealing with payroll deductions for state employees who join any group medical plan, makes a clear distinction between regular insurance companies and "nonprofit membership corporation[s] organized under the laws of this State, for the purpose of defraying the cost of medical services. . . ." (See, also, Stats. 1939, ch. 250, p. 1505; Stats. 1940, First Ex. Sess., ch. 45, § 6.7.)

This conclusion becomes more apparent when the purpose and nature of many of the legislative requirements are considered, particularly those relating to the maintenance of reserves and to the regulation of investments and financial operations. The extensive insurance regulations primarily are designed to protect the insured, or the public, from the insurer. (52 Harv.L.Rev. 815.) Such regulations become important only if the insurer has assumed definite obligations. Conversely, it is evident that they are not intended to apply where no risk is assumed and no default can exist. Further-

more, by the very nature of its operations, the service could not accumulate vast reserves. The flow of funds from patient to physician primarily is on a monthly basis of pay-as-you-go and to require reserves would be a useless and uneconomic waste. (*Jordan* v. *Group Health Ass'n, supra,* p. 251; see 53 Yale L.J. 171.)

For these reasons the respondent is not engaged in the business of insurance within the meaning of the regulatory statutes but is subject to the limited supervision provided by section 593a of the Civil Code. The judgment of the trial court in this regard is not too broad, for every decision is limited to the evidence upon which it is based.

The judgment is affirmed.

Shenk, J., Carter, J., Peters, J. pro tem., and Ward, J. pro tem., concurred. Schauer, J., concurred in the judgment.

GIBSON, C. J.—I concur in the judgment solely on the ground that the Legislature, by the enactment of section 593a of the Civil Code, exempted organizations coming within its scope from regulation by the Insurance Commissioner. By providing for supervision by a professional board and by the attorney general (Civ. Code, §§ 593a, 605c), the Legislature has evidenced an intention to free such organizations from other regulation and from the necessity of complying with the various requirements, such as the maintenance of reserves, which are imposed on regular insurance companies. The need for regulation or supervision, the amount thereof and the persons, bodies or officers who should supervise or regulate are all matters which are confided to the Legislature, and it was within the legislative discretion to provide that a limited regulation of such nonprofit organizations was sufficient.

I cannot, however, concur in that portion of the opinion declaring that the plaintiff is exempted from regulation by the Insurance Commissioner because it is not engaged in the business of transacting insurance, but is merely agreeing to render service. The true test is not the character of the consideration agreed to be furnished, but whether or not the contract is aleatory in nature. A contract still partakes of the nature of insurance, whether the consideration agreed to be furnished is money, property or services, if the agreement is aleatory and the duty to furnish such consideration is dependent upon chance or the happening of some fortuitous event. (See Rest.,

Contracts, § 291.) In the present case, the agreement is to make payments to member doctors for medical services to the beneficial members, and the duty to make such payments is obviously dependent upon chance or the happening of a fortuitous event, since the necessity for the services, and also for the agreed payment, is dependent upon the members' sickness or accidental injury.