[Civ. No. 4517.    Fourth Dist.    July 22, 1953.]

JOHN R. MALONEY, as Insurance Commissioner, etc., Respondent, v. AMERICAN INDEPENDENT MEDICAL AND HEALTH ASSOCIATION (a Corporation) et al., Appellants.

320

Foster W. Powell and Joseph E. Daly for Appellants.

Edmund G. Brown, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

BARNARD, P. J.—This is an appeal from a judgment in a proceeding brought by the Insurance Commissioner against the American Independent Medical and Health Association, which will be referred to as A.I.M., and its directors. On November 20, 1950, the Insurance Commissioner filed an application for an order appointing a conservator or liquidator of A.I.M., under sections 1015 and 1011. (All section numbers herein refer to the Insurance Code unless otherwise stated.) An order was made appointing the Insurance Commissioner as such conservator and he took charge of the records and business of A.I.M. These appellants filed an answer to the application and a petition for the removal of the conservator, and also filed a cross-complaint for declaratory relief to which an answer was filed by the commissioner. The court found in all respects in favor of the commissioner, and entered a judgment adjudging that A.I.M. was transacting insurance business in this state without the certificate required by section 700; that it was insolvent; appointing the Insurance Commissioner as liquidator; and directing him to wind up said business for the benefit of its members, its creditors,

and the public, in accordance with the provisions of sections 1010-1016.  This appeal followed.

There is no dispute as to the material facts.  A.I.M. commenced operations in June, 1947, as an unincorporated association.  In June, 1948, it was incorporated as a nonprofit corporation pursuant to title 1, division 2 of the Corporations Code.  Its main purpose, as set forth in its articles, was ''to enter into contracts with duly licensed physicians, surgeons and hospitals for the purpose of making available to the members of this corporation and their dependents, medical, surgical, hospital and related health services.''  The articles provide for five directors who should have the right to vote, and that ''no other member or members shall have any voting right.''  Three of the original directors consisted of Mr. and Mrs. Fortune and the latter's mother.  The other two directors resigned in 1949, and were not replaced.  The by-laws were amended to provide that Mr. and Mrs. Fortune should have full authority to obligate and bind the corporation in all matters pertaining to contracts or financial matters in which the corporation had an interest, or to which it was a party; and that Mr. and Mrs. Fortune should have authority to change or amend any of the membership certificates or services or by-laws, subject only to ratification by the membership committee, of which Mrs. Fortune was to be chairman and to appoint the other two members.  The directors then entered into a contract with Mr. and Mrs. Fortune, retaining him as ''technical business consultant'' and her as ''office management consultant.''  This contract provided that for his services as such consultant Mr. Fortune was to be paid $150 per week retainer, plus 1 per cent of the ''net sale income'' of A.I.M., plus an additional amount for expenses.  It also provided that in the event of his retirement 50 per cent of the average amount paid to him during his active participation should be paid him during the balance of his life, with a guaranteed period of 10 years in any event, and with the further provision that after his death, whenever it occurred, the 1 per cent of the net sale income should be paid to his estate at monthly intervals, ''so long as this association shall exist.''  A similar but smaller compensation was provided for Mrs. Fortune.

Solicitation for membership was limited to California.  The public at large was solicited and members were not required to belong to any particular organization or lodge, to be em-

ployed by any particular employer, or to have any particular characteristic in common with other members. The solicitors were paid on a commission basis and after procuring an application they would send the amount collected, less the commission, to the A.I.M. office which would then issue to the member a contract in the form set forth as "Exhibit B" in the stipulation of facts. At the time the commissioner took possession of A.I.M., in November, 1950, there were 1,600 active memberships outstanding which represented, on a family basis, about 5,000 people. Various forms of certificate of membership had been issued by A.I.M. but in November, 1950, most of those outstanding were in the form of "Exhibit B."

A.I.M. furnished no medical care itself, and employed no doctors. A member needing medical or hospital care was supposed to inform a doctor or hospital that he was a member of A.I.M., and ask them to send their bills direct to A.I.M. In most cases, the bills were paid by A.I.M. directly to the doctor or hospital. In a few cases A.I.M. paid the member direct, where he had already paid the bill.

The contract issued by A.I.M. (Exhibit B), is headed "Certificate of Beneficial Membership," and is strikingly similar to the ordinary health insurance policy. It consists of nine pages with an annexed "Fee Schedule" setting forth several hundred fixed fees for specific medical services. It provides that A.I.M. issues this certificate to the member for a term of one year; and that "A.I.M. agrees that the benefits recited herein shall be available to the member" providing the member is eligible for such benefits under the terms set forth in the certificate and in accordance with the "accompanying fee schedule governing the specific availability of the respective benefits." It then states that when the member is confined in any licensed hospital anywhere in the world "your A.I.M. membership pays for" a list of named hospital benefits; that A.I.M. membership pays for certain surgical and medical benefits which are listed; and that "These benefits are available to members and dependents when care and service is rendered by any licensed physician or surgeon" according to the association's fee schedule. The certificate then provides that these benefits "shall be available" to the member during the periods for which membership dues are paid in advance; for the payment of renewal dues in advance; for a "grace period" of 10 days; and for reinstatement in case of suspension for nonpayment of dues. It then provides that the member may select any licensed hospital or licensed physician

or surgeon; that when first applying for professional services the member must notify the doctor or hospital that he is a member of A.I.M.; that A.I.M. shall treat with all licensed hospitals and licensed doctors equally; that the benefit provisions shall apply whether the illness or injury occurs within this state "or anywhere in the world"; that in case of bodily injury or illness "A.I.M. assures the member benefits applying to expenses actually incurred in such procedures but not to exceed the amount of benefits specified in the schedule"; that claim for benefits must be made in writing to A.I.M. within 45 days of the first day that care or treatment was rendered; that proof must include an itemized statement from the doctor or hospital involved; and that in case a member received benefits in connection with a personal injury caused by the negligence of another, and then recovers damages through action, settlement or otherwise, A.I.M. should be subrogated to such claim and be entitled to the monies thus received to the extent of any and all benefits paid under this certificate. It was then provided that A.I.M. would faithfully perform the duty of "agent and custodian" for its members; that each physician and surgeon or professional man assumes full responsibility for his own acts of omission or commission; and that A.I.M. is not an insurer or liable for negligence on the part of any hospital.

A form of a letter sent out to doctors by A.I.M. in March, 1950, appears in the record. This letter states that it is sent to the doctor so that he will be familiar with "our procedures" in the event that "one of our members" should need his services; that A.I.M. will pay the full amount of the fees set forth in the enclosed medical schedule; that these fees are higher than those "offered by the average insurance company"; that the doctor is free to charge the patient additional fees if he so desires; and that all checks for services rendered to members are made payable only to the doctor. At the bottom of this letterhead, in large letters, appear the words "WE HAVE NO PANEL DOCTORS    NO MEMBER HOSPITALS."

When the insurance commissioner took possession of A.I.M. in November, 1950, an audit of its books disclosed that its liabilities exceeded its assets by $56,619.44; that of this amount $39,108.86 was owed to Mr. Fortune and $11,796.67 was owed to Mrs. Fortune under their compensation and expense contract; that 85 per cent of all dues and fees collected by the corporation were used for overhead and promotion; and that

only 12 cents of each dollar of dues collected had been used to pay medical and hospital claims for members.

Admittedly, A.I.M. has never applied for a certificate of authority or other permit to transact an insurance business in this state, as required by section 700; it has not complied with the requirements for the issuance of such a certificate; it has never complied with section 9201 of the Corporations Code; and it does not possess the qualifications required for the issuance of the certificate mentioned in that section.

At the trial counsel for A.I.M. stated that the only issue to be decided was whether this nonprofit corporation had been engaged in the insurance business, and conceded that if it had been doing an insurance business it had no defense to this proceeding. It is here contended that the application filed by the Insurance Commissioner did not state facts constituting a cause of action; that the court had no jurisdiction over the proceeding because A.I.M., being organized as a nonprofit corporation, was not subject to any of the regulations set forth in the Insurance Code; that it was operating under its charter as a nonprofit corporation, and "rendering services"; that it was merely acting as an agent for its members, and assuming no risk; that all risk was assumed by licensed doctors and hospitals who looked solely to the corporation for compensation upon a fixed schedule of fees; and that it follows that A.I.M. was merely rendering a service and not transacting an insurance business of any kind. In support of these contentions appellants rely on *California Physicians' Service* v. *Garrison,* 28 Cal.2d 790 [172 P.2d 4, 167 A.L.R. 306], and *Transportation Guar. Co.* v. *Jellins,* 29 Cal.2d 242 [174 P.2d 625].

It is argued that section 9200 of the Corporations Code permits the organization of a nonprofit corporation for the purpose of "rendering services"; that the basic and fundamental purpose for which A.I.M. was formed, as expressed in its articles of incorporation, was to enter into contracts with licensed doctors and hospitals for the purpose of making medical and hospital service available to its members; and that the provisions of the Insurance Code cannot be applied to a corporation thus organized for that express purpose.

While section 9200 of the Corporations Code authorizes the formation of a nonprofit corporation for the purpose, among other things, of rendering services, it also provides that this authorization shall be "subject to laws and regulations applicable to particular classes of nonprofit corporations or

lines of activity." Not only are some of the provisions of the Insurance Code existing laws and regulations which are applicable to this class of nonprofit corporation and this line of activity, but section 9201 of the Corporations Code provides other requirements for the formation of a nonprofit corporation for certain purposes, which would include the basic purpose here involved. Moreover, it clearly appears, by evidence and admission, that A.I.M. entered into no contracts with licensed doctors or hospitals for the purpose of making these medical and health services available to its members, and entirely failed to carry out the main purpose of its organization.

There is no merit in the contention that A.I.M. was merely rendering a service to its members, as distinguished from transacting an insurance business, and there is nothing in the cases cited which compels or supports such a conclusion. On the contrary, the business transacted by A.I.M. constitutes an insurance business as defined in *California Physicians' Service* v. *Garrison,* 28 Cal.2d 790 [172 P.2d 4, 167 A.L.R. 306]. By the certificates of beneficial membership issued A.I.M. agreed that it would make the specified benefits available to the member when needed, in return for the dues paid. A.I.M. employed no physicians and made no contracts with hospitals, and its contract clearly discloses that it was itself rendering or furnishing no such service. The member, when needing such services, was to secure them wherever he desired and anywhere in the world. The corporation agreed to pay the bills therefor, within specified limits, and this was not dependent upon the amount of dues that might be collected from other members within any period. Under this contract A.I.M. undertook to indemnify the beneficiary member against the hazards of illness or injury by paying the medical and hospital bills specified. There was no agency here, other than that common to any insurance contract, and the business here transacted was not a mere rendering of service within the principles established in the case of *California Physicians' Service* v. *Garrison, supra.* While the assumption of a risk is not the sole test of the status involved, there was here a definite assumption of risk on the part of the corporation, and not merely one assumed by the doctors and hospitals as argued by the appellants.

No service was rendered or to be rendered by A.I.M. other than that of paying the bills incurred by the members, in

accordance with its agreement; the doctors were to get a fixed fee regardless of the amount of dues collected; any increase of illness or injury would increase the cost to A.I.M.; and whether benefits were to be furnished, and the amount furnished, was dependent upon chance. Viewing the plan of operation as a whole, it clearly appears that its only object and purpose was in the nature of an "indemnity" and not merely the furnishing of a "service." The findings that A.I.M. was transacting insurance business in this state without the certificate required by section 700, and that it was insolvent within the meaning of the provisions of the Insurance Code, are fully supported by the record.

Some contention is made that the summary seizure provisions of the Insurance Code, which are here involved, are in violation of the constitutional guarantees against search and seizure. This contention is without merit. (*Carpenter* v. *Pacific Mut. Life Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761]; *Rhode Island Ins. Co.* v. *Downey,* 95 Cal.App.2d 220 [212 P.2d 965].)

Finally, it is contended that the dissolution of a corporation, or forfeiture of its franchise, can be accomplished only by a quo warranto proceeding. Whether or not this is true in view of the provisions of section 1017, need not be here decided. The judgment appealed from provided for the winding up of the insurance business being conducted by A.I.M., but made no provision for dissolution of the corporation itself.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.