[L. A. No. 22535. In Bank. July 9, 1954.]

COMPLETE SERVICE BUREAU (a Nonprofit Corporation) et al., Respondents, v. SAN DIEGO COUNTY MEDICAL SOCIETY (a Nonprofit Corporation) et al., Appellants.

Brooks Crabtree, Peart, Baraty & Hassard, Gray, Cary, Ames & Frye, Howard Hassard, Musick, Peeler & Garrett and James E. Ludlam for Appellants.

Anthony J. Kennedy as Amicus Curiae on behalf of Appellants.

Sloane & Fisher and Harrison G. Sloane for Respondents.

Thielen, Marrin, Johnson & Bridges and Hansen, Hazen & Lynch as Amici Curiae on behalf of Respondents.

SHENK, J.—This is an appeal from a judgment for the Complete Service Bureau and certain physicians and laymen connected with it as cross-defendants. Equitable relief was denied to the San Diego County Medical Society and 32 individual physicians as cross-complainants. The general problem is whether the activities of the cross-defendants constitute the unlawful practice of medicine as alleged in the cross-complaint.

On October 16, 1948, Complete Service Bureau, hereinafter called CSB, and three of the physicians associated with it filed a complaint against the San Diego County Medical Society and several of its members. The complaint alleged that the defendants in conjunction with the California Medical Association and the American Medical Association were engaged in a conspiracy in restraint of trade. It prayed for damages and equitable relief. The defendants answered and filed a cross-complaint. The cross-complaint alleged that CSB, Group Property, Incorporated, and William David Parmer were unlawfully engaged in the corporate and lay practice of medicine by controlling the group practice of medicine carried on by CSB; that the physicians connected with CSB

were unlawfully aiding and abetting the lay practice of medicine; that fees paid to CSB for medical services were, in effect, fee-splitting with an unlicensed person and that such a practice is unlawful; that CSB obtains patients through intensive solicitation; that the commercialization of the practice of medicine is inherent in the activities of CSB, Group Property, and Parmer; that this is harmful to the public health and welfare and in addition constitutes an invasion of the property rights of the San Diego County Medical Society and the individual cross-complainants; that much of the advertising engaged in by the defendants is misleading; and that the practices engaged in by the cross-defendants amount to unfair competition with respect to the members of the San Diego County Medical Society.

It appears that in 1939 William David Parmer, Lester Seaman, and Robert Perrott, all laymen, organized CSB under the general nonprofit corporation law, now Corporations Code, section 9200. The articles of incorporation stated that the main purposes of CSB were to establish a fund by periodic payments on the part of its members to be used to defray the costs of medical services and hospital care; to supply or procure for members and their families medical, hospital, and other services at the lowest cost, and to furnish these services to its members ''without profit to any agency.''

After its incorporation in 1939 CSB arranged with Doctor Stevenson and his associates to do the medical work for its members. Originally the contracts issued to the members were in the name of Doctor Stevenson or his group. After 1946, subscribers were given agreements in the name of CSB. These agreements stated that CSB agreed to provide medical, surgical, and hospital services according to the provisions set forth; that the dues were $2.50 per month; that the subscriber was entitled to up to 30 days' hospitalization for each illness or injury, and was entitled to ambulance service up to $10 for each illness or injury, and that the subscriber was entitled to medical services in accordance with the schedule of fees listed. The fee schedule ran from $1.50 for an office visit to $95 for minor or major surgery.

CSB now has a panel of 10 licensed physicians to treat its subscribers. Included among these physicians are Doctor Chester J. Antos, who is a former Director of Maternal and Child Hygiene of the Missouri Board of Health, a former instructor at the Washington University Medical School, and a licentiate of the American Board of Pediatrics; Doctor

Marcus G. Kelly, who is a past president of the Gila County, Arizona, Medical Society, a fellow of the American College of Surgeons, and a fellow of the American Medical Association; Doctor Grant W. Lee, who is an associate of the International College of Surgeons; and Doctor George R. Stevenson, who is a life member of the American College of Surgeons. These and the other physicians included in the panel are compensated according to a unit system. The patients are billed by CSB for the services performed by the doctors and the bills are collected by CSB, which now has approximately 10,000 members. Some of them have voting rights and all of them are entitled to those rights within a certain period of time.

In 1939 CSB entered into a contract with Parmer to employ him as business manager for 20 years. CSB occupies a medical building under an oral lease with Group Property. Parmer and Doctor Stevenson were the two principal shareholders of Group Property, which is a stock corporation. Under the lease CSB pays as rental 10 per cent of its income. Group Property has spent about $100,000 in remodeling, fixtures, and furnishings for the medical building. No salaries are paid by Group Property and no dividends have been declared or paid.

From October, 1948, until September, 1951, the parties were engaged in matters of pleading in the superior court. The defendants and cross-complainants moved to have the equity issues tried by the court before submitting the law issues to the jury. This motion was granted. The trial commenced on September 12, 1951. Shortly thereafter the plaintiffs dismissed the equity features of their complaint with prejudice. The trial was then directed to the equitable issues raised by the cross-complaint. At the conclusion of the trial the defendants moved for a judgment on the pleadings with respect to the plaintiffs' complaint, contending that with the equity features removed it did not state a cause of action. The trial court denied the motion and rendered its decision on all the equitable issues raised by the cross-complaint in favor of the cross-defendants. Findings of fact and conclusions of law were made and filed upon which judgment was entered. The cross-complainants appeal from the judgment. Since the appeal was taken Mr. Parmer has passed away and his wife, as administratrix, has been duly substituted in his place.

Whether an action such as this may be prosecuted in

behalf of the physicians of California to prevent the illegal practice of medicine seems never to have been decided by the courts of this state. (*Chalmers-Francis* v. *Nelson*, 6 Cal.2d 402, 404 [57 P.2d 1312].) It is unnecessary to decide that question now for, on September 9, 1953, section 2436 of the Business and Professions Code went into effect. (Stats. 1953, p. 1423.) That section provides: ''Whenever any person has engaged or is about to engage in any acts or practices which constitute or will constitute an offense against this chapter, the superior court of any county, on application of the board or of 10 or more persons holding physician's and surgeon's or chiropodist's certificates issued under this chapter, may issue an injunction or other appropriate order restraining such conduct. Proceedings under this section shall be governed by Chapter 3 of Title 7, Part 2, of the Code of Civil Procedure, except that no undertaking shall be required in any action commenced by the board.'' ■ This law is applicable to the questions presented on this appeal for ''whatever may be the law applicable to appeals generally, the rule is well settled that on appeals involving injunction decrees, the law in effect when the appellate court renders its opinion must be applied.'' (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal.2d 489, 527-528 [45 P.2d 972, 1014]; see also *Doctor Miles Calif. Co.* v. *Sontag Stores Co.*, 8 Cal.2d 178, 179 [64 P.2d 726].) It is not disputed, and the trial court found as a fact, that the individual cross-complainants were all licensed physicians. ■ There are more than 10 of them and they are entitled under section 2436 of the Business and Professions Code to bring an action to enjoin a violation of chapter 5 of that code. ■ Section 2436 does not confer a right of action upon the San Diego County Medical Society for that section applies only to ''the board [of medical or osteopathic examiners] or . . . 10 or more persons holding physician's and surgeon's or chiropodist's certificates. . . .'' Because of our conclusions on the merits of the appeal as raised by the individual cross-complainants, it is unnecessary to decide whether the county medical society has any standing, apart from the statute, to prosecute this action.

The cross-complainant physicians do not question the competency of the medical services rendered by the physicians connected with CSB, but they contend that the activities of the cross-defendants violate chapter 5 of the Business and Professions Code. The basis for this contention is the claim

that a nonprofit medical service corporation may only be formed under Corporations Code, section 9201, and that CSB is incorporated under Corporations Code, section 9200, an allegedly inapplicable section.

Corporations Code, section 9200, was formerly section 593 of the Civil Code. This section was enacted in its original form in 1870. (Stats. 1870, pp. 46, 402.) Since 1939 it has provided that: "A nonprofit corporation may be formed . . . for any lawful purposes which do not contemplate the distribution of gains, profits, or dividends to the members thereof and for which individuals lawfully may associate themselves, such as . . . for rendering services, subject to laws and regulations applicable to particular classes of nonprofit corporations or lines of activity. Carrying on business at a profit as an incident to the main purpose of the corporation and the distribution of assets to members on dissolution are not forbidden to nonprofit corporations, but no corporation formed or existing under this part shall distribute any gains, profits, or dividends to any of its members as such except upon dissolution or winding up."

The immediate question is whether a nonprofit medical service corporation may be formed under section 9200. A somewhat similar situation was presented to the United States District Court for the District of Columbia in *Group Health Association* v. *Moor*, 24 F.Supp. 445. The court there stated at page 446: "The plaintiff is not of course practicing medicine in the sense that it is itself prescribing for the sick, and it contends that it only enters into contract with duly licensed physicians who themselves attend the members of the corporation and if necessary prescribe for them.

"I see no reason why an individual may not without violating the statute [District of Columbia Healing Arts Practice Act] contract with a physician for medical services for a stipulated period at fixed compensation; and it would seem that a group of individuals might make the same arrangement with a group of physicians. It would seem that this group of individuals might incorporate themselves for their own mutual benefit for the same purpose." It was said in *Pacific Employers Ins. Co.* v. *Carpenter*, 10 Cal.App.2d 592 at page 595 [52 P.2d 992] that "professions are not open to commercial exploitation as it is said to be against public policy to permit a 'middleman' to intervene for profit in establishing the professional relationships between the members of said profession and the members of the public." ■ However,

this principle is not contravened by permitting a group of interested persons to form a nonprofit corporation to secure for themselves medical services at a low cost.

It is argued, however, by the cross-complainants that although it may have been permissible to form a nonprofit medical service corporation under section 9200 in the past, the Legislature has expressly provided that such corporations may only be organized under section 9201.

In 1947 the Legislature enacted section 593a of the Civil Code which is now Corporations Code, section 9201. That section provides: ''A nonprofit corporation may be formed under this part for defraying or assuming the cost of professional service of licentiates under any chapter of Division 2 of the Business and Professions Code or of rendering such services, but it may not engage directly or indirectly in the performance of the corporate purposes or objects unless all of the following requirements are met: (a) At least one-fourth of all licentiates of the particular profession become members. (b) Membership in the corporation and an opportunity to render professional services upon a uniform basis are available to all licensed members of the particular profession. . . .''

Section 9201 did not purport to repeal any portion of section 9200. The language of section 9201 is permissive and not mandatory. There would therefore seem to be no valid objection to the formation of a nonprofit medical service corporation under section 9200 as well as 9201. A contrary conclusion might lead to serious legal difficulties. For example, the evidence in this case shows that on February 2, 1939, California Physicians Service (hereinafter referred to as CPS) was incorporated as a nonprofit medical service corporation under section 9200, although it now claims to operate under section 9201. CSB was incorporated under section 9200 in July of 1939. Apparently the Kaiser Foundation Health Plan, amicus curiae, and many fraternal and beneficial organizations which provide medical services to their members are incorporated under section 9200. These organizations, and particularly CSB, which was incorporated under section 9200 prior to the enactment of section 9201, entered into contracts with subscribers and other persons to effectuate their purposes. If the Legislature by enacting section 9201 had intended to eliminate the preexisting nonprofit medical service corporations formed under section 9200 a question of the impairment of contracts might arise. In addition, the evidence in this case shows that CPS is sponsored by the

California Medical Association and all of the county medical societies. If section 9201 should be held to be the only section under which a nonprofit medical service corporation may incorporate CPS might exercise a monopoly in that field and thus raise other legal problems. ■ It is unlikely that the Legislature was considering fraternal and other mutual nonprofit corporations when it enacted section 9201; for it seems unreasonable that the Legislature would require fraternal and other nonprofit organizations to include as members "one-fourth of all licentiates of the particular profession" or that these limited groups must provide "an opportunity to render professional services . . . to all licensed members of the . . . profession." (See *Accounting Corp.* v. *State Board of Accountancy,* 34 Cal.2d 186 [208 P.2d 984].)

In *Maloney* v. *American Independent Medical & Health Assn.,* 119 Cal.App.2d 319 [259 P.2d 503], the defendant corporation appealed from a judgment in behalf of the Insurance Commissioner appointing a liquidator to take charge of the defendant's business. The defendant health corporation in that case was incorporated under Corporations Code, section 9200, but the trial court there found that it was actually transacting an insurance business for profit and that it was insolvent. The judgment of the trial court which ordered the appointment of a liquidator pursuant to the provisions of the Insurance Code was properly affirmed. ■ However, the opinion in that case stated that a nonprofit medical service corporation may only be organized under Corporations Code, section 9201. This statement was unnecessary to the decision, is inconsistent with the holding of the present case, and is disapproved.

It is next contended by the cross-complainants that even if a nonprofit medical service corporation may be organized under Corporations Code, section 9200, and therefore the activities of the cross-defendants are not illegal, the cross-defendants are violating certain sections of chapter 5 of the Business and Professions Code and that these alleged violations should be enjoined.

The cross-complaint alleged that CSB was practicing medicine, which if true would be a violation of Business and Professions Code, section 2008. That section prohibits a corporation from practicing medicine except where certain requisites have been met and no charge for the medical services rendered is requested.

Doctor George Stevenson, a member of the CSB medical

staff, was called as a witness by the cross-complainants under section 2055 of the Code of Civil Procedure. He testified that he had never encountered any lay interference with his medical practice while associated with CSB. Doctor Joseph Loucks, who had been associated with CSB from 1946 to 1948, also called as a witness by the cross-complainants, testified that while connected with CSB: "We handled the patients medically as we saw fit." Doctor Robert Williams, a former member of the CSB medical staff, and Doctors Livingstone, Riddell, Ivens, and Burak, members of the CSB medical staff, were called as witnesses by the cross-defendants and testified that at no time during their association did they encounter any lay interference with their practice of medicine.

It is apparent that the testimony of the above mentioned members of the medical profession constitutes substantial evidence to support the trial court's finding that: "None of the cross-defendants, except the licensed physicians, George R. Stevenson and Chester J. Antos, has ever engaged in, nor is he now engaged, directly or indirectly, in the practice of medicine or surgery."

The cross-complaint also alleged that CSB and its medical staff were engaged in fee-splitting which, if true, could be a violation of section 2392 or section 2399 of the Business and Professions Code. To substantiate this charge the cross-complainants point to Parmer's management contract with CSB; CSB's rental contract with Group Property; the unit system by which the medical staff of CSB is compensated; and the disposition of the dues collected by CSB.

In 1939 CSB entered into a contract with Parmer employing him as manager for 20 years. This contract was made assignable and inheritable. The contract provided that Parmer was to receive as compensation 25 per cent of the monthly dues paid by the members of CSB and 25 per cent of all gross revenue received by CSB from any source; that Parmer need not devote his full time to CSB; that he might employ such assistants as he saw fit, their salaries to be paid by CSB; and that he be granted an option to purchase at any time any or all of the real and personal property owned by CSB at its original cost less depreciation. In 1946, Parmer's contract with CSB was changed so that his percentage of dues was reduced to 10 per cent, and he waived his right to receive 25 per cent of CSB's revenues from other sources.

We are here concerned with the operations of the cross-

defendants under the contract. As to the power of CSB to execute such a contract it has been held that "questions concerning the exercise of corporate powers cannot be raised collaterally by a third person, but by the state in *quo warranto* proceedings. [Citations.]" (*Vesper* v. *Forest Lawn Cemetery Assn.*, 20 Cal.App.2d 157, 169 [67 P.2d 368].) Under that rule the cross-complainants would have no standing to attack any of the internal transactions, as such, between CSB and Parmer and the other directors in this action ■ However, if the result of such intracorporate activity would be a violation of chapter 5 of the Business and Professions Code the mere fact of incorporation under Corporations Code, section 9200, cannot protect the cross-defendants. (See *Maloney* v. *American Independent Medical & Health Assn.*, *supra*, 119 Cal.App.2d 319, where the fact of incorporation under section 9200 did not preclude an action against the corporation for violating provisions of the Insurance Code.) The question is whether Parmer's operations under the contract resulted in fee-splitting.

■ The cross-complainants state that Parmer received $99,800 under the management contract in the 12 years from July 1, 1939 to July 31, 1951. Doctor Clifford Loos, a partner in the Ross-Loos Medical Group in Los Angeles, was called as a witness by the cross-complainants. He qualified as an expert in the field of cooperative medical groups. Doctor Loos testified that the salary for a lay business manager for a small clinic ranged from $6,000 to $15,000 a year. On redirect examination he testified that he thought the average salary for a manager for a clinic the size of CSB was about $6,000 a year. Parmer's salary under the contract averaged approximately $8,320 a year, well within the salary range testified to by Doctor Loos, and only $2,320 above the specific estimate given by the doctor.

As previously stated, CSB occupies a medical building under an oral lease from Group Property, a stock corporation of which Parmer and Doctor Stevenson were the principal shareholders. Under the lease CSB pays as rental 10 per cent of its income. Again, we are concerned in this action with the question whether the lease was a device for fee-splitting. As hereinbefore stated no salaries are paid by Group Property, no dividends have been declared or paid, and Group Property has spent about $100,000 in remodeling, fixtures, and furnishings for the medical building which CSB occupies.

The cross-complainants contend that the fact that CSB bills the private patients of the doctors on its medical staff and only remits half of the fee so collected to the doctor who treated the patient shows that CSB is engaged in fee splitting. Doctor Stevenson testified that the 50 per cent went for overhead and that this was a proper amount for the reason that most men who "have practiced medicine a number of years, have found that [it] is substantially what it costs a man to operate his private business, about fifty per cent of his income, to maintain proper offices and personnel, and all of equipment and depreciation, cost him about fifty per cent of his income to practice medicine." Doctor Loos testified that: "For any practice that grosses under $10,000 a year, fifty per cent of that is usually allocated for overhead"; that the Ross-Loos Clinic bills the private patients of the doctors connected with it; that 50 per cent of the amount collected is given to the doctor; and that the other 50 per cent is retained by the clinic as the amount allocated for overhead.

Doctor Stevenson testified that except for their first year with CSB all the doctors were compensated according to a unit system; that dues and fees collected from patients according to the contract schedule paid for "all of the services in the entire medical setup"; and that a portion of the dues was allocated to a fund to provide for hospitalization of members entitled to it.

It is customary for medical groups to pay rent, employ business managers, and compensate members on a unit basis. (Group Medical Practice, 4 Stan.L.Rev. 401, 409, 411, 413; Hunt and Goldstein, Medical Group Practices in the United States: III, 135 A.M.A.J. 904, 906.) There is substantial evidence to support the trial court's finding and conclusion that: "No one of cross-defendant physicians and surgeons has ever engaged in splitting fees with unlicensed persons not entitled to practice medicine or surgery in the State of California."

In the cross-complaint it was alleged that: "Cross-Defendants have been and now are engaged in misleading advertising. . . ." Section 2380 of the Business and Professions Code, part of chapter 5 of that code, provides: "All advertising of medical business which is intended or has a tendency to deceive the public or impose upon credulous or ignorant persons and so be harmful or injurious to public

214

morals or safety constitutes unprofessional conduct within the meaning of this chapter.''

 The cross-defendants, aside from contesting this allegation on the merits, claim that section 2380 is not applicable to them. They argue that this section is only applicable to members of the medical profession and not to nonprofit medical service corporations such as CSB and CPS; and that the standard for nonprofit medical service corporations should be the general rule against misleading advertising in that activity—a different standard. However, it seems reasonable to conclude that the language ''all advertising of medical business'' is sufficient to include nonprofit medical service corporations.

Numerous advertisements by CSB were introduced in evidence. Likewise many advertisements of CPS were received to show the type of advertising used by nonprofit medical service corporations. In *The T. J. Hooper*, 60 F.2d 737, Judge Learned Hand stated at page 740: ''There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence. . . . Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It may never set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.'' The fact that CSB and CPS used the same type of advertising is merely to be considered in determining the standard exacted by section 2380.

 In a memorandum opinion the trial court correctly stated: ''The phrase 'prepaid medical plan' is employed by both CSB and CPS in their advertising. Neither one really offers what might be called a fully prepaid medical plan— a plan which entitles a member to full medical service on prepayment of his dues. The member understands that the prepayment of his dues entitles him to participate in the plan. He knows that for certain types of care and treatment he will have to pay the scheduled fee. The literature explains all this. No one is deceived, no one is misled.''

 Among the statements made in advertisements by CSB which are attacked are: ''Surprise! A 24-hour Medical-Surgical Hospital Service For Only $2.50 a month'' and ''You will be surprised how much medical, surgical and hos-

pital care you can buy for $2.50 a month." It is alleged that these statements falsely indicate that the $2.50 pays for some medical services whereas the subscriber must pay an additional charge for medical services in accordance with a fee schedule. As the trial judge pointed out, no subscriber thinks he is going to receive complete medical, surgical, and hospital care by prepaying $2.50 a month. All of CSB's members were advised of the medical fee schedule which was part of their contract. By paying $2.50 a month they were able to get medical care at the fee schedule and in that way it contemplated lower medical costs. Part of the $2.50 went in rental to Group Property, which has expended over $100,000 on the medical building which houses CSB; and because the doctors used the building the overhead expenses were reduced thereby permitting the lower schedule of medical fees. The two above quoted advertising statements are not objectionable and the trial court properly refused an injunction as to them.

The cross-complainants also attack another advertising statement made by CSB. It reads: "Your money goes for Medical Care and other Health Services exclusively." It is admitted that Parmer received a certain amount of the dues as his salary for being business manager and that a certain portion was paid as rent to Group Property. As above indicated it is customary for medical groups and clinics to pay rent and employ business managers. The CPS follows this practice. Whether CSB's subscribers should have assumed this when reading the above quoted statement is conjectural. It probably made no difference to them. It cannot be said as a matter of law that this statement violated section 2380. No abuse of discretion on the part of the trial court in denying an injunction as to that statement has been shown. There is substantial evidence to support the trial court's finding that: "None of the cross-defendants has been, nor is, engaged in false or misleading advertising."

Section 2380.5 of the Business and Professions Code provides: "All advertising of the medical business in connection with which the holder of any certificate fails to use his name constitutes unprofessional conduct within the meaning of this chapter." This section is not applicable to nonprofit medical groups because they do not hold medical licenses and are not advertising in behalf of any particular doctors. In the case of CSB the evidence shows that the affiliation of a doctor may be terminated by him or by CSB upon

60 days' notice; and that there were many doctors affiliated with it since its inception. The names of these doctors could not be used because they were not obligated to stay with CSB for more than 60 days.

The cross-complaint alleged that the cross-defendants solicited business through hired solicitors. Section 2399 of the Business and Professions Code provides: ''The employment of 'cappers' or 'steerers' or other persons in procuring practice for a practitioner of a system or mode of treating the sick or afflicted provided for in this chapter constitutes unprofessional conduct within the meaning of this chapter.'' The evidence shows that nonprofit medical service groups solicit members. CPS has a radio program. Both CSB and CPS engage in newspaper advertising to secure new members. CPS and CSB have ''membership drives.'' CPS has local civic committees to encourage membership. CSB admits using paid solicitors. A letter from CPS to its doctor members which was received in evidence states: ''In order that our physician members may have the maximum benefit from this district office we are asking you to take advantage of the sales personnel in the office by forwarding notice of sales leads.'' It is clear that the activities of the nonprofit medical service corporations in securing members is not ''procuring practice for a practitioner'' as contemplated by section 2399. As stated the personnel of the doctors affiliated with CSB is not constant. This indicates that the members are being solicited to join the group and not for any particular practitioner.

Certain portions of the cross-complaint alleged in substance that the activities of the cross-defendants amounted to unfair competition. Civil Code, section 3369, confers standing upon the cross-complainants to bring an action for unfair competition. There is no evidence in the record which would support a finding of unfair competition and the trial court correctly found against the cross-complainants on this point.

In addition to defending on the merits the cross-defendants pleaded laches and unclean hands. The court made no finding as to laches. There was some evidence introduced on the question of unclean hands. The court found as a fact that ''Cross-Complainants, through their sponsorship of and participation in California Physicians Service, a nonprofit corporation, engage in substantially the same policies and practices which they enumerate as unethical and unlawful acts on the part of cross-defendants in connection with advertising by said corporation of medical services,

soliciting of patients through hired solicitors, paying un-licensed persons not entitled to practice medicine or surgery in the State of California out of monies collected from patients, and using the name California Physicians Service for advertising purposes in connection with named physicians.'' The trial court's finding was to the effect that both the cross-complainants and the cross-defendants are engaged in substantially similar practices; and it has been held that these activities are legal. The question of unclean hands is not in this case in any substantial sense.

Finally, the trial court made the following general finding: "None of the policies or activities of Cross-Defendants is harmful, injurious or inimical to the public health or welfare. None of them tends to demoralize the medical profession in the County of San Diego or elsewhere. None of them does or will prevent the establishment and maintenance of adequate or reasonable standards. None of them does or will lower the standards of the medical profession or degrade the practice of medicine, to the detriment of health of anyone.'' There is sufficient evidence in the record to support the findings and conclusions of the trial court which in turn support the judgment denying the injunction.

The judgment is affirmed. ·

Gibson, C. J., Carter, J., Traynor, J., and Schauer, J., concurred.

SPENCE, J., Dissenting.—I am in general accord with the views expressed in the dissenting opinion of Mr. Justice Edmonds but desire to add certain additional observations.

The majority opinion recognizes that the real question here does not involve primarily a determination of the general powers of a so-called nonprofit corporation but rather a determination of the legality of the general plan adopted as evidenced by the particular contractual arrangements existing between Complete Service Bureau and the other cross-defendants. As to the contract with Parmer, it is said: "We are here concerned with the operations of the cross-defendants under the contract''; and as to the lease with Group Property it is said: "Again, we are concerned in this action with the question whether the lease was a device for fee-splitting.'' But having thus defined the real issues involved, the majority opinion ignores the uncontradicted evidence concerning these contractual arrangements and affirms a judgment which places

the stamp of approval upon a plan whereby Parmer and certain lay associates developed a commercial venture for profit, in which venture Parmer and his lay associates solicited patients for a limited panel of doctors selected by them and split the medical fees and other income derived from these activities. In other words, the uncontradicted evidence conclusively shows that Parmer, acting individually and through Group Property, a profit corporation which he controlled, was intervening as a "middleman" for profit in establishing the professional relationships between a group of approximately ten doctors and members of the public. Arrangements of this type have been consistently condemned. (*People* v. *Pacific Health Corp.*, 12 Cal.2d 156 [82 P.2d 429, 119 A.L.R. 1284] ; *Pacific Employers Ins. Co.* v. *Carpenter*, 10 Cal.App. 2d 592 [52 P.2d 992], and authorities cited.)

It seems entirely clear under the rules established by the cited authorities that the incorporators of the nonprofit corporation, as individuals, could not have lawfully developed the profit-making plan under the type of agreements disclosed by the evidence. It necessarily follows that the development of such profit-making plan could not be made lawful by the mere device of forming a so-called nonprofit corporation which corporation, rather than the individual or individuals, entered into similar unlawful agreements. In this connection, it is significant to note that nonprofit corporations formed under section 9200 of the Corporations Code can only be formed for "lawful purposes . . . for which individuals lawfully may associate themselves . . . subject to laws and regulations applicable to particular . . . lines of activity." It should also be noted that if the mere device of forming such a corporation could legalize activities which were otherwise illegal, then such corporations could be organized for the purpose of permitting laymen and lay agencies, through similar contractual arrangements with such corporations, to intervene for profit in establishing the relations between members of the public and a single practitioner or a limited group of practitioners in any of the learned professions, including the legal profession. Heretofore such arrangements have always been declared to be against the public policy of this state, and if any change in policy is to be made, that change should be declared by the Legislature rather than by the courts.

EDMONDS, J.—The law applicable to associations which perform the service of bringing together licensed practitioners

and persons desiring medical treatment has been reviewed in other cases. (See *California Physicians' Service* v. *Garrison*, 28 Cal.2d 790 [172 P.2d 4, 167 A.L.R. 306] ; *People* v. *Pacific Health Corp.*, 12 Cal.2d 156 [82 P.2d 429, 119 A.L.R. 1284].) Generally, there can be no valid objection upon legal grounds to the formation of a nonprofit corporation or cooperative association for the purpose of obtaining medical service for its members. Such service may be provided by contracting with a group of practitioners to supply it, whether upon the basis of fixed period payments or according to a schedule of charges. But the present record establishes additional elements of lay participation which, in my opinion, unquestionably constitute unlawful medical practice.

One of the charges made by the medical association against Parmer and Complete Service Bureau is that the financial arrangements made with the physicians employed by the bureau, in legal effect, amount to the splitting of fees with a layman or a corporation composed of laymen. It has been held that professional fee-splitting occurs "where a member of a profession divides the compensation he receives from a patient with another member of the same profession or any person who has sent the patient to him or has called him into consultation." (*Lieberman* v. *Connecticut State Bd. of Examiners in Optometry*, 130 Conn. 344 [34 A.2d 213, 216].)

Fee-splitting agreements between professional men and laymen as a reward for procuring employment tend to commercialize the profession, are contrary to public policy and are void. (See anno. 86 A.L.R. 195.) Otherwise stated, the professions "are not open to commercial exploitation as it is said to be against public policy to permit a 'middleman' to intervene for profit in establishing the professional relationships between the members of said professions and the members of the public." (*Pacific Employers Ins. Co.* v. *Carpenter*, 10 Cal.App.2d 592, 595 [52 P.2d 992].)

The record shows without contradiction these facts:

Each member of the nonprofit corporation pays to it a monthly membership fee of $2.50, for which he is entitled to receive certain hospital service. If he desires other medical service, he must pay to the bureau an additional amount based upon a fixed schedule of fees. Depending upon the type of treatments involved, the physicians on the bureau's panel receive about 50 per cent of the amount paid to the corporation, which they distribute among themselves according to a unit system. These physicians also treat "pri-

vate'' patients, unconnected with Complete Service Bureau, and pay to it about 50 per cent of the fees received from such patients.

Under his manager's contract, Parmer, or the person who inherits his contractual rights, is entitled to receive 10 per cent of the membership dues, with a minimum guarantee of 25 cents per month per member. And, although since 1946 he has waived the right to claim it, under his contract he is entitled to an additional 25 per cent of the gross receipts of the bureau *from all other sources.* These rights stem from a contract under which there are no fixed duties to be performed by the manager, and which is expressly made assignable and inheritable.

Additionally, Group Property Incorporated, a stock corporation for profit of which Parmer, until his death, was president and majority stockholder, is entitled to receive as rent for the real property occupied by the bureau and for all the medical equipment used by it another 10 per cent of all income received *from all sources.*

Under this arrangement, the business manager of the bureau and the corporation, principally owned and controlled by him, receive a direct commercial advantage in establishing the relationship of doctor and patient. The legal devices of stock ownership, and a manager's contract which fixes no duties should not obscure the significance of the arrangement as one in which a layman may use the professional relationship of doctor and patient as a source of commercial profit. That profit increases not only with the number of members in the bureau, but also with the frequency and extent of their medical treatments, factors which the manager as the controlling officer of the bureau is in a position to influence.

One reason suggested for holding that these practices do not amount to fee-splitting is that the present record does not show that Parmer and Group Property have received an excessive amount under the arrangement. It is suggested that Parmer has received no more than the average business manager, and Group Property has expended large sums in remodeling but has declared no dividends. But there is considerable doubt as to whether, in view of the vague nature of his duties, the amount paid Parmer under the contract can be said to be compensation. And it is not an answer to the charge of commercialization that Group Property has declared no dividends. Certainly, the net worth of the corporation has been increased by ''rental'' payments and the value

of its property increased by improvements, and, as controlling shareholder, Parmer or his successor easily may tap those resources merely by declaring a dividend. In any event, it is a novel proposition of law that one who receives funds from an improper source, or gains them in an improper manner, may be excused from legal consequences if he does not take too much.

The nature of Parmer's participation as one of commercial exploitation is made evident from a history of his dealings with the bureau, dealings which have been exceedingly profitable. His contract with the bureau enables him to maintain almost complete control of it. Almost continuously, Parmer has been president of the bureau and a member of its board of trustees. The trustees, other than Parmer, have been his secretary, and either a close friend of Parmer or one of his employees. His contract as manager has entitled him to a percentage of the bureau's total income as well as a guaranteed minimum income from the dues of members.

The premises now occupied by the bureau, originally owned by Parmer, were sold to it in 1940 for $31,000, but with an option to Parmer to repurchase them and all fixtures and equipment owned by the bureau at their original price less depreciation. Six years later, he exercised the option, paying the bureau with stock of Group Property. He then resold the property to Group Property for $102,500 in stock. In short, these dealings demonstrate Palmer's complete control and participation in Complete Service Bureau for commercial advantage.

The basis for the refusal of the trial court to consider these factors appears to have been its belief that the appellants were without standing to challenge them as an unlawful practice of medicine. In his memorandum opinion, the trial judge stated ''what the terms of the management contract should be, what salary should be paid or is paid, what the rent should be, what property the corporation is to purchase, what the members shall pay as dues, what the employees shall do or what pay they shall receive, are matters for the stockholders or members of the corporation to decide, and are not open to inquiry by SDCMS, CPS, or any other corporation or person not connected with CSB. . . . The State, by a proceeding in the nature of *quo warranto,* may proceed to forfeit and dissolve the corporate existence for acts of usurpation of powers, or may proceed in like manner against any usurpation of franchise by any corporation or

person, or the State or a shareholder may proceed by injunction against a corporation or its officers.''

By the present decision the cross-complainants are given legal standing to challenge Parmer's participation in Complete Service Bureau as an unlawful medical practice, but it is held that the evidence supports the conclusion of the trial court that there was no fee-splitting. Plainly Parmer's participation was not considered by the trial court in this connection.

Many people who advocate increased availability of medical service to persons of low or moderate incomes may welcome the establishment of plans similar to the present one without a discriminate inquiry into their business bases. However, in the long run, to ignore unlawful practices incident to them will benefit neither the public nor the profession. I would hold that Complete Service Bureau's division of the medical fees received by it with its business manager and Group Property on a percentage basis constitutes an unlawful medical practice, and enjoin its continuance.

Appellants' (San Diego County Medical Society et al.) petition for a rehearing was denied August 4, 1954. Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.